# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

MARC WEINREICH, an individual,

    Plaintiff,

v.

CYNTHIA BROOKS, an individual;
GREENFIELD ENVIRONMENTAL TRUST
GROUP, INC., a Massachusetts corporation;
DAVID DABNEY, an individual; and
DOES 1-3,

    Defendants.

Case No. 1:21-cv-10496-NMG

## FIRST AMENDED COMPLAINT

## INTRODUCTION

This is a minority shareholder oppression and corporate freeze-out case. The corporation at issue is Defendant Greenfield Environmental Trust Group, Inc. ("Greenfield" or the "Company"), a Massachusetts closely held corporation co-founded over twenty years ago by Defendant Cynthia Brooks ("Brooks"), the 51% and majority shareholder, and Plaintiff Marc Weinreich ("Weinreich"), the 49% and minority shareholder. Together, Brooks and Weinreich grew the Company—a court-designated environmental response and custodial trustee that works to clean up contaminated sites throughout the country—into a successful and profitable business. But beginning in or around 2018, Brooks' greed, desire to completely control the Company, and desire to retaliate against Weinreich for bringing to her attention the ways in which she and the Company failed to act in the best interest of their federal and state beneficiary clients, led her to hatch a scheme that ultimately forced Weinreich out of the Company they founded and built

together.  Brooks used her majority shareholder status and her friends within the Company, including Defendant David Dabney—whom she ultimately installed as a Director—to oppress Weinreich and to force him out.  With Dabney's assistance and extra vote on the Board of Directors, Brooks, in violation of the fiduciary duty of utmost good faith and loyalty that she owed Weinreich, stripped Weinreich of his long-standing positions as Director and Officer of the Company and as the Co-Managing Principal of Multistate Trust (defined hereafter), the Company's largest trust appointment.

Even after the Company actually and constructively terminated Weinreich, Brooks was still not satisfied.  Among other things, Brooks, Dabney, and the Company manipulated the valuation process for Weinreich's shares in which he was required to engage pursuant to the Company's Articles of Organization.  During this process, Brooks, Dabney, and the Company either engaged in actions that depressed the value of Weinreich's shares or so mismanaged the Company after ousting Weinreich that his shares were worth far less than they had been during an independent valuation in March 2019.  Weinreich was ultimately forced to sell his shares for far less than that independent valuation and the actual value of those shares.

Weinreich brings this case to hold the Company, Brooks, and Dabney responsible for their breaches of fiduciary duties, breaches of contract, tortious interference with business relations, defamation, and supporting acts of aiding and abetting and civil conspiracy.  Weinreich also brings a claim for wrongful termination in violation of public policy since Brooks froze out Weinreich, in part, to silence him and prevent him from bringing concerns to the attention of the government beneficiaries that the Company and Multistate Trust served.  Among other practices, Brooks initiated, engaged in, or condoned excessive billing practices, excessive fiduciary compensation, questionable employee work and project quality by Brooks' friends or those loyal

to her, and the creation of a new administrative layer that would increase Company revenue without adding appreciable value, in conflict with the Company's fiduciary duty to preserve trust assets. Weinreich seeks damages for the substantial losses he has incurred as a result of these actions, as more fully described below.

## PARTIES

1.     Plaintiff Marc Weinreich ("Weinreich") is a citizen and resident of the State of Utah. Along with Brooks, Weinreich is the co-founder of the Company. From 2000 until 2018, he was a 49% minority shareholder, Officer (Vice President) and a member of the Board of Directors of the Company. Weinreich also served as Co-Managing Principal of the Multistate Trust and other Company trust appointments.

2.     Defendant Cynthia Brooks ("Brooks") is a citizen and resident of the Commonwealth of Massachusetts. At all times relevant to this Complaint, Brooks was and, on information and belief, continues to be a 51% majority shareholder, Officer (President), and a member of the Board of Directors of the Company. Brooks also served as Co-Managing Principal of the Multistate Trust and other Company trust appointments.

3.     Defendant Greenfield Environmental Trust Group, Inc. ("Greenfield" or "Company") is a closely held corporation organized under the laws of the Commonwealth of Massachusetts with a principal office located in Cambridge, Massachusetts. The Company is in the niche for-profit business of being appointed by federal and state governments as a court-designated environmental response trustee to own and clean up contaminated sites throughout the country. The Company forms single-purpose limited liability legal shell businesses to serve as the trustees of the trusts, with the Company retaining domination and control of each limited

3

liability company trustee as its sole member.  The beneficiaries of the trusts are federal and state governments, represented by various departments and agencies.

4.      Defendant David Dabney ("Dabney") is a citizen and resident of the State of Maryland.  At all times relevant to the allegations made herein, Dabney traveled to and conducted business within the Commonwealth of Massachusetts as an employee of the Company and later as a Director of the Company.

5.      Does 1-3 are other individuals within the Company who, on information and belief, met, aided, abetted, and conspired with Brooks and Dabney to engage either directly through the Company or indirectly through the Multistate Trust in the freeze-out and oppression, breaches of fiduciary duties, and tortious and other improper conduct described herein. Weinreich will seek leave of court to amend this Complaint to allege the true names and capacities of these defendants when and if their involvement and identities are ascertained.

## THE MULTISTATE TRUST

6.      Though not a party at this time, Greenfield Environmental Multistate Trust LLC ("Multistate Trustee") is the duly appointed Trustee of the Multistate Environmental Response Trust (the "Multistate Trust"), which plays a central role in this action.  The Multistate Trust was established as part of the global settlement of the Tronox bankruptcy on February 14, 2011 in the U.S. Bankruptcy Court for the Southern District of New York in the matter of *In re: Tronox Incorporated, et al.*, Case No. 09-10156 (ALG).  The Company is the sole member of the Multistate Trustee.  Neither the Multistate Trustee nor the Multistate Trust have employees. Instead, the Company's employees, provide the professional, fiduciary, administrative, management, oversight, and services required by the Multistate Trustee and the Multistate Trust.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the plaintiff and the defendants are citizens of different states and the amount in controversy exceeds $75,000.00.

8.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Alternatively, venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(3) because the Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

### I.    Formation of Greenfield Environmental Trust Group, Inc.

9.     Weinreich and Brooks have known each other and worked together professionally since 1989.  Weinreich worked as outside counsel for a predecessor trust company Brooks previously owned, operated, and later sold (together with a related subsidiary) in its entirety to a Seattle, Washington based company (the "Buyer") in or around 1999.

10.     Contemporaneous with its purchase of Brooks' company, the Buyer hired Brooks and Weinreich, who opened the Buyer's northeast office together and worked as the Buyer's full-time employees.  In or around 2000, Weinreich and Brooks agreed to separate from the Buyer's struggling business and start a new environmental trust business as partners.  To simplify administrative formalities, Weinreich and Brooks agreed to form their new venture on, what was then, the inactive debt-ridden shell of the Massachusetts company the Buyer was

abandoning.  Weinreich and Brooks rebranded, restructured, and renamed their new entity,

"Greenfield Environmental Trust Group, Inc."

11.     Once the Company was formed, Weinreich was designated Vice President and

Brooks President.

12.     The new Company issued new shares of stock to each of them, Brooks having

completely divested her shares in the predecessor entity to the Buyer.  Brooks wanted the shares

of the Company to be divided 50/50.  Weinreich convinced Brooks to accept 51% of the shares

(with 49% to him) so the Company could qualify as a woman-owned business.

13.     In all matters and in every manner except percentage, Weinreich and Brooks

agreed to be equal partners in the Company.  Weinreich and Brooks agreed that, despite

corporate titles, all major decisions regarding the Company would be made jointly and in

consultation with each other.

14.     Consistent with their agreement to be equal partners in the Company, Weinreich

and Brooks also served as Co-Managing Principals of the Multistate Trust, the Company's

largest trust appointment, when formed in 2011.

15.     Weinreich and Brooks complied with their agreement concerning control of the

Company and Multistate Trust in act and deed and in all respects for almost twenty years, until

Brooks began acting in direct contravention of the agreement in order to implement her freeze-

out of Weinreich in or about 2018.

16.     During their almost twenty-year partnership, Weinreich and Brooks were the

only shareholders and Officers of the Company.  They also served as the only Directors on the

Board of Directors, until Brooks installed Dabney as a Director in 2019.  Further, for

approximately eleven years, from its founding in or around 2000 until in or 2011, Brooks and Weinreich were the Company's sole employees.

17.     Weinreich and Brooks repeatedly reaffirmed to each other in word, practice, and through published organizational charts their agreement to co-manage, co-lead and co-govern the Company and its trusts, including the Multistate Trust.  They also represented to the public and to the many private industry and governmental entities with whom the Company did business they were partners who jointly owned and operated the Company.

18.     Weinreich and Brooks further agreed in word and practice that the profits of the Company would be distributed to each of them according to their pro rata ownership interest or as otherwise agreed to by both partners.

19.     As co-founder, Officer, Director, shareholder, one of only two employees for approximately eleven years, and thereafter, one of up to twenty-five employees, Weinreich had a reasonable expectation of working in a co-management, co-leadership, and co-governance employment role for the Company and Multistate Trust until he retired.

20.     Weinreich and Brooks had an oral agreement with each other and the Company, reaffirmed on numerous occasions, that they would each work in a co-management, co-leadership, and co-governance employment role for the Company and Multistate Trust until their respective retirements.

21.     By investing his substantial professional skill, judgment and experience in co-founding and building the Company, foregoing other professional and financially rewarding opportunities initially and over time, and acting to work the Company out of debt incurred by the Buyer, Weinreich assumed substantial professional, financial, and personal risk.

22.     Weinreich did so because of his reasonable reliance upon his agreement with Brooks and the Company, and his reasonable expectation that he would have a continuous co-management, co-leadership and co-governance role in the operation and oversight of the Company and its trust appointments, including but not limited to the Multistate Trust; continued employment as co-managing partner of the Company and its trust appointments, including the Multistate Trust; and would get the long-term return on his substantial professional investment through his shareholder distributions and compensation in amounts roughly proportionate to his share of ownership interest through retirement and thereafter if the Company continued operations or was sold.

23.     Weinreich and Brooks' employment with their business was so intertwined with their shareholder investments as to be inseparable from the investments.

## II.     The Company Performs an Independent Investigation of an Employee's Complaints Against Brooks.

24.     In 2009, on behalf of the Company, Weinreich and Brooks jointly procured and began co-managing an approximately $138 million bankruptcy court environmental trust appointment for four sizeable and complex hazardous waste sites in Montana.  The beneficiaries of the Montana trust are solely governmental entities, including the United States.

25.     As Brooks and Weinreich agreed and represented to the government beneficiaries during the interview process, Weinreich relocated to the Western part of the country in 2009 to be more proximate to the Montana trust appointment, ultimately settling in Utah.

26.     Weinreich and Brooks hired their first full-time employee, Alicia Voss ("Voss"), who supported the largest of the four Montana trust projects and who reported directly to Brooks. In or around 2011, Voss and Brooks had a falling out, making various workplace-related accusations against each other.

27.     Under Weinreich's leadership, the Company engaged a Montana employment lawyer to lead an investigation.  The employment lawyer engaged an outside consulting firm to a perform an unbiased independent investigation of the complaints.  On or about October 2011, the outside consulting firm issued a comprehensive, detailed 314-page investigation report.

28.     To safeguard his partner and their Company, with Brooks' approval, Weinreich took over direct supervision of Voss, eventually terminating her.  Voss filed a civil action in the United States District Court for the District of Montana (Helena Division) against the Company and Weinreich claiming wrongful discharge.  Weinreich facilitated a settlement of the lawsuit.

29.     In an email dated April 18, 2012, Brooks wrote Weinreich stating: "I involved you in this case because you needed to be involved and I needed you to be involved. It was and is our company. Yes. I'm sorry that I involved you in the process of selecting her for the job and the process of eliminating her from the job. . . . I'm sorry that she has named you and not me."

30.     As a result of the 2011 lawsuit, Weinreich procured for the Company an Employment Practices Liability (EPL) insurance policy to protect the Company and, indirectly, its beneficiaries, against the risk of employee actions.

### III.     Tronox and Other Trust Appointments.

31.     Tronox was spun out of Kerr-McGee (an oil, gas, and chemical company) when Kerr-McGee decided to separate its chemical from its oil and gas business.  Burdened by Kerr-McGee's legacy chemical environmental liabilities, Tronox filed for Chapter 11 bankruptcy protection.  Tronox emerged from bankruptcy on February 14, 2011, when its plan of reorganization was confirmed.

32.     Through the Company's wholly-owned, trustee limited liability companies that Weinreich established, the Company was eventually appointed as trustee of two of the five

Tronox environmental trusts established as part of the global settlement of the Tronox bankruptcy: the Multistate Trust and the Savannah Trust.

33.     On February 14, 2011, the Multistate Trust took legal title to more than twenty-five significantly contaminated properties in fourteen states and would perform or fund clean up at thousands of potentially contaminated former service station properties and other hazardous waste sites in a total of thirty-one states around the country, many of which the Multistate Trust also owned.

34.     Along with legal title to many of the sites, the Multistate Trust received Tronox settlement funding of $100,819,000 and an approximately 25% interest in the fraudulent conveyance lawsuit then being prosecuted by a separate trust against Anadarko (which had acquired Kerr-McKee shortly after its spin-off of Tronox).  The beneficiaries of the Multistate Trust are solely governmental entities including the United States.

35.     Also on February 14, 2011, through a separate wholly-owned limited liability company trustee, the Company was appointed trustee of a sister trust, the Savannah Trust.  The Savannah Trust was responsible for the management, ownership, cleanup, and sale of former titanium dioxide facility in Savannah, Georgia and the operation of a thirty-employee active sulfuric acid plant.  The beneficiaries of the Savannah Trust are solely governmental entities, including the United States.

36.     In addition to his multiple demanding responsibilities for the Company, the Multistate Trust, and other trust appointments, Weinreich also managed the complex Savannah Trust, including all sulfuric acid plant operations, without appreciable support from Brooks or any other Company employees.

37.     At the time of the Tronox bankruptcy, Weinreich was also poised to procure the Tronox Henderson Trust for the Company when Brooks requested that he not proceed with the interview based on the Company's existing book of business. Respecting his partner's wishes, Weinreich agreed and cancelled the interview.

## IV.     Weinreich and Brooks Grow Their Business to Twenty-Five Employees and Profits Skyrocket.

38.     To maximize the use and longevity of the initial Tronox settlement funding for the benefit of the government beneficiaries, the sites, and the many impacted communities around the country, Weinreich and Brooks intentionally kept the Company and the Multistate Trust thinly staffed so as to preserve and extend trust dollars. From 2011 to 2014, the Company hired only seven additional employees.

39.     At or around the Tronox settlement, a separate trust known as the Anadarko Litigation Trust (the "Litigation Trust") assumed the prosecution of the Kerr-McKee/Anadarko fraudulent conveyance litigation. To oversee the Litigation Trust's activities, the Anadarko Litigation Trust Advisory Board ("TAB") was established. The TAB members unanimously elected Weinreich as the Chair at the first meeting and he served continuously in that position until TAB and the Litigation Trust both wound down in 2015 and 2016, after the final distribution of the more than $5.14 billion in settlement proceeds generated from the fraudulent conveyance litigation.

40.     Given the incoming influx of funding from the fraudulent conveyance litigation into the Multistate Trust, which ultimately turned out to exceed $1.2 billion, Weinreich realized that the Company needed to rapidly increase its staffing levels to meet government beneficiary expectations. Weinreich and Brooks agreed to grow their Company organically through hiring

on an as-needed basis as a way to meet the anticipated increased expectations and their own goals of protecting human health and the environment.

41.     Weinreich and Brooks grew the Company in size from fewer than ten employees in 2014 to twenty-five employees located in approximately thirteen states by 2018.

42.     As the Company added more employees, Weinreich spearheaded efforts to improve the Company for its employees and ensure that it survived beyond its founders.  For example, while performing all of his other many project duties and without assistance from Brooks, Weinreich oversaw the establishment of a Company-wide health insurance plan for all employees and the establishment of a 401(k) plan for the Company and its employees.

43.     With the sudden addition of multiple employees, Company revenue, which was based on professional hourly fees drawn directly from the managed trust funds, increased substantially.  With the relatively new Montana and Tronox trust appointments, free cash (net expenses) distributions from the Company each year totaled in excess of $1 million.  By 2018, free cash distributions exceeded $5 million.

**V.     Tensions Mount and Resentment Builds.**

44.     Although Weinreich and Brooks were longtime business partners and friends, tension grew between them as a result of Brooks' increasing desire for control of the Company and its revenue, her resentment when Weinreich raised concerns about potential fiduciary opportunism, her excessive hours worked, her unfounded concern that Weinreich might be trying to position himself to take control, and her jealousy over Weinreich's accomplishments.

**A.     Weinreich Voices Concerns to Brooks Over the Appearance of Fiduciary Opportunism, Including Excessive Billing and Compensation.**

45.     While Weinreich was overseeing the running of most of the operational and administrative duties of the whole Company and within the Multistate Trust and managing

various environmental projects in detail, Brooks focused almost exclusively on billing project management work.

46.     Weinreich voiced concerns to Brooks about her consistent annual average billing of 2,900 hours (with Weinreich's billings averaging 2,250 hours).  Weinreich's concern was based, in part, on a concern for Brooks' health and well-being and on whether such unusually high billing for several years in a row was opportunistic and excessive in breach of the fiduciary duties owed to the government beneficiaries, or would be viewed as such by the government beneficiaries.

47.     The court-approved Multistate Trust documents did not provide the government beneficiaries with the direct ability to access or review the Company's financials.  The Company held the funds from which it would be paid by its "client" the Multistate Trust.  On a monthly basis, the Company would submit an invoice to the Multistate Trust for professional services rendered, in essence moving the invoice from one hand to the other.

48.     Weinreich was concerned that, if the government beneficiaries had transparency, some might question in good faith certain aspects of the invoices, such as Brooks' aggregate hours for all of the trust appointments.

49.     Weinreich expressed his concerns to Brooks, but Brooks refused to validate or act on Weinreich's concerns.  Brooks summarily dismissed Weinreich and his concerns, insisting instead that she worked "harder" than Weinreich and everyone else in the Company because she "billed" an average of 2,900 hours a year.

50.     Brooks and Weinreich had always discussed and agreed to an end-of-year compensation bonus for Brooks to account for the discrepancy between their billable hours before distributing the profits of the Company.  They based the division on their pro rata

percentage ownership interests in the Company and then would agree to an additional minimal discretionary amount ranging from approximately 3-6% each year to reflect Brooks' excessive hours.

51.    In or around 2017, Weinreich and Brooks' overall annual compensation began to increase significantly with the full effect of the Kerr-McKee/Anadarko settlement funds and the financial leverage from more than twenty Company employees billing to multiple projects.

52.    As result, Weinreich also became concerned that his and Brooks' compensation from their small, private for-profit company managing environmental trusts for the public good might be viewed as excessive or opportunistic by government lawyers, as well as by environmental justice and other communities hosting Multistate Trust hazardous waste sites. Weinreich felt that the Company might have public relations issues, if not legal exposure, unless Weinreich and Brooks got in front of the issue.

53.    By way of example only, on information and belief, in 2019 Brooks' total cash compensation exceeded $3,000,000.  By comparison, according to public records, in 2019 total cash compensation for the President of Tronox Holdings was $2,250,000 and Anadarko Petroleum Corp. (successor to Kerr-McGee) was $2,063,946.

54.    To address these issues, Weinreich recommended to Brooks that the Company engage an independent compensation specialist to ensure compensation paid was consistent with their fiduciary obligations and industry standards and, at the very least, to be able to demonstrate to trust beneficiaries, if asked, that Weinreich and Brooks had mitigated concerns about financial opportunism through excessive compensation by utilizing an outside expert.  Brooks rejected this recommendation.

55.     Weinreich also recommended that he and Brooks establish an independent, unbiased Board of Directors to ensure the Company's actions were in accordance with the fiduciary duties it owed to its government beneficiaries while also remaining prosperous.  Brooks also rejected this recommendation.

### B.  Weinreich Voices Concerns to Brooks Over Certain Employees.

56.     In the several years prior to her freeze-out of Weinreich, Brooks began hiring her friends to handle significant duties within the Company.  She informed Weinreich of her desire to hire each friend on information and belief only after she had already discussed employment with the friend.

57.     Weinreich agreed in order to support his partner, but had concerns that the Company should instead hire individuals with more direct prior hazardous waste management and community participation experience who lived closer to the Multistate Trust sites (so as to come from the communities) and whose actual costs would be less expensive to the Multistate Trust because they resided near the sites and would not have the same compensation expectations as Brooks' friends.

58.     These concerns increased as there were significant issues with the costs (including, without limitation, extra travel costs) and performance of some of the friends hired and retained by Brooks, as well as the extra layer of administration and cost created by Brooks to justify and fund those positions at the expense of the Multistate Trust.

59.     Weinreich brought these issues to Brooks' private attention, expressing concern about fiduciary standards of care and unnecessary costs to the Multistate Trust.  Brooks disregarded his concerns and suggestions.

15

60.     For example, Weinreich questioned the need for a "Director of Construction Services" for the Multistate Trust, the position Brooks hired her friend Richard Elliott ("Elliott") into.  Many of the Multistate Trust's sites were still in the investigation phase, rather than the remedial design and construction phase, and hazardous waste remedial construction projects could be managed directly by third-party contractors.

61.     Brooks disregarded Weinreich's concerns regarding Elliott.  Brooks awarded Elliott the Director of Construction Services title but tasked him to serve as the Project Manager for a site in Navassa, North Carolina, a site that, on information and belief, did not then require construction services.  Further, it was not clear to Weinreich that Elliott had the hazardous waste and redevelopment skills required for the position.

62.     Weinreich also raised with Brooks specific concerns about the performance of Lauri Gorton ("Gorton"), the Director of Environmental Programs and Senior Strategist.  At one site for which Brooks had primary responsibility as Co-Managing Principal, Weinreich learned Gorton authorized and performed clean up of a downgradient site area without first confirming the upgradient area had been adequately remediated.  At another site for which Brooks had primary responsibility as Co-Managing Principal, on information and belief, Gorton's failure to have her contractors follow proper safety protocols caused a local commercial airport to lose power, forcing it, on information and belief, to temporarily suspend flights.

63.     February 2021 court filings made by the National Association for the Advancement of Colored People ("NAACP") in its effort to reopen the Tronox bankruptcy cases and the Anadarko adversary proceeding confirmed Weinreich's suspicions and concerns regarding these employees.

64.    The NAACP singled out Gorton's site in Columbus, Mississippi for which Brooks had primary responsibility as Co-Managing Principal, calling out the Multistate Trust for its "slow and inefficient work" at the site.  The NAACP also singled out Elliott's site in Navassa, North Carolina for which Brooks had primary responsibility as Co-Managing Principal, stating "nothing [was] done in six years."

65.    Further, Weinreich learned from these filings that Brooks concealed from him a letter sent by the NAACP to Brooks about the Multistate Trust's management of the Columbus site.  In the August 15, 2019 letter attached the NAACP's filing, Rev. Steve Jamison wrote to Brooks, among other things, "if you cannot tell me how you plan to right the wrongs you have done in our community, I have no choice but to see you as an extension of Kerr McGee and the corrupt system that allowed them to walk away . . . ."

66.    Despite his then status as an Officer, Director, and shareholder of the Company, and in violation of the fiduciary duty of utmost good faith and loyalty she owed to Weinreich, Brooks concealed Rev. Jamison's August 15, 2019 letter from Weinreich and never shared it or the fact of its existence with him.

### C. Brooks Explodes with Rage at the Company's Salt Lake City May 2018 Retreat.

67.    The Company and its trusts operated virtually with all employees working from home offices.

68.    Since it was rare for more than a few employees to gather together at any given time and unprecedented for the entire Company to be together, Weinreich and Brooks organized the Company's first ever company-wide retreat to be held in Salt Lake City in May 2018.

69.    Weinreich felt the retreat in Salt Lake City presented a unique opportunity to engage employees around three areas of importance to the employees and the Company:  (1)

Company vision; (2) a commitment to collaborative, inclusive, and aligning communication practices with each other and the outside world; and (3) post-founder Company sustainability strategies.

70.     A Company calendar and schedule were prepared and distributed, which was crowded with events and tight time schedules to ensure all topics could be adequately covered.

71.     Weinreich also engaged the facilitation services of a Denver-based leadership and teamwork management consulting firm called The Collaborative Way.  The two guiding ethical principles of The Collaborative Way are: "Inclusion" (or "Who should be included in the conversation to achieve the required result?") and "Alignment" (or "Are we addressing the issue in a way that would build alignment and connection vs. forcing our views on others?").  The five specific commitments that individuals make to each other when practicing The Collaborative Way include: "Listening Generously," "Speaking Straight," "Being for Each Other," "Honoring Commitments," and "Acknowledge & Appreciate."  Brooks supported and agreed with the use of The Collaborative Way as the retreat's facilitator and initially agreed that the principles it espoused could be of use to and benefit the Company.

72.     Brooks kicked off the retreat with a discussion of one of her earliest projects.  Her presentation significantly exceeded the scheduled time allotted for it.

73.     After her presentation, Brooks looked at her phone and her computer during the program.  Because seating was in a semi-circle, all employees could see each other, including Brooks.

74.     Weinreich quietly and privately approached Brooks during a break to suggest that multi-tasking during the retreat sent an inconsistent message to their Company's employees.  He

also reminded her that the schedule they had agreed to was extremely tight and that everyone, including her, should try to stay with it.

75.     Weinreich was unaware at the time, but Brooks became enraged by his comments to her.  She said very little to him for the rest of the day.  Then, at a Company-wide dinner that evening, Brooks pulled Weinreich aside and loudly and aggressively yelled at him in a location very near to the Company's employees.  During her outburst, Brooks accused Weinreich of trying to steal the Company from her and vowed that she would not let that happen.

76.     Brooks' behavior was explosive, sudden, and indifferent to the proximity of their employees and the nature of the event.

77.     Weinreich had no idea what Brooks was referring to or insinuating, had never heard a complaint or concern even remotely approaching this from Brooks or anyone else, and had always acted in furtherance of the fiduciary duty of utmost good faith and loyalty he owed Brooks in any event.

78.     In retrospect, Brooks' outburst at the Company-wide dinner was a defining moment in their relationship.

79.     Thereafter, it later became clear to Weinreich that Brooks had decided to undertake a concerted and sustained effort to freeze Weinreich out of the Company.  In relative short order, Brooks would enact her scheme to freeze out Weinreich by restructuring governance within the Company's key Multistate Trust appointment and concentrating power and control in herself and her friends while stripping Weinreich of his employment, including his long-standing roles and responsibilities.

## VI.  **Brooks' Scheme to Freeze-Out Weinreich.**

80.     In or about 2018, Brooks began the process of freezing Weinreich out of the Company by restructuring the Company to concentrate power and control in herself and her friends and to strip Weinreich of his roles and responsibilities.

81.     On information and belief, Brooks secretly recruited select Company employees to help her implement her plan to force Weinreich out.  She secured their loyalty with friendship, job promotions, and accompanying salary increases.

82.     On information and belief, Brooks disclosed the private concerns expressed by Weinreich to her about some of the employees to those employees and used that information to create a false narrative about his interactions with certain of those employees in furtherance of her efforts to freeze out Weinreich.

83.     In furtherance of her tortious scheme, Brooks met secretly with these employees to discuss, design, and refine her reorganization plan, as well as to position herself to be able to attribute her plan to them.

84.     On information and belief, Brooks charged the Multistate Trust for her efforts to freeze Weinreich out of the Company for her personal benefit in violation of the Company's duties to the Multistate Trust and unnecessarily exposing the Company to liability.

85.     Following the Salt Lake City retreat, the employees with whom Brooks was conspiring began to act increasingly insubordinate to Weinreich.

86.     Brooks and the employees also began to make false statements to other employees and certain Multistate Trust contacts about Weinreich in order to undermine his authority, impugn his reputation, and force him out.

### A.  Brooks Uses Promotions to Secure Loyalty and Erode Weinreich's Authority.

87.     Instrumental to Brooks' freeze-out plan was securing the loyalty of other

employees within the Company through promotions and the assignment of responsibilities once

held by Weinreich.

88.     Brooks secured the support of her friend Dabney by creating a new position for

him in the Multistate Trust—Chief Operating Officer—and assigning him duties that Weinreich

once performed.  Brooks' creation of this position reinforced Dabney's loyalty to her while

eroding Weinreich's authority and standing in the Multistate Trust and the Company.

89.     On information and belief, Brooks used similar tactics to secure the loyalty of

Kathy Vanderhook-Gomez ("Vanderhook-Gomez"), an attorney hired from the U.S. Department

of Justice.  Through Brooks' multiple Multistate Trust reorganization charts, Brooks

demonstrated to Vanderhook-Gomez and to the entire Company she was promoting

Vanderhook-Gomez into Weinreich's leadership legal role in the Multistate Trust.  In doing so,

Brooks earned Vanderhook-Gomez's loyalty, confused Company employees about Weinreich's

authority and status, and eroded Weinreich's credibility in the Multistate Trust and the Company.

90.     Two of the employees that Brooks enlisted, Dabney and Elliot, were personal,

long-time friends whose loyalty she knew she could count on.  Others, such as Vanderhook-

Gomez and Gorton, were employees Brooks could count on because she befriended them and

fostered their loyalty, and through *quid pro quo* promises and delivery of job promotions and

salary increases and/or bonuses.

**B. *Brooks Unilaterally Invents a Leadership Team.***

91.     On information and belief, without informing Weinreich, Brooks met with employees loyal to her to develop and implement a plan under which Brooks would take sole management, leadership, and governance control of the Multistate Trust.

92.     To facilitate the plan, without Weinreich's knowledge or consent, Brooks unilaterally established a new administrative layer within the Multistate Trust which she called the Leadership Team.  Brooks populated the Leadership Team solely with employees loyal to her.

93.     When Weinreich learned of the Leadership Team created by Brooks, he immediately and thereafter opposed it.  Weinreich told Brooks that her Leadership Team would create extra and unnecessary administrative fees for the Company billed to the Multistate Trust that had not been needed for the last eight years, leading to a new revenue source for the Company but to the detriment of the beneficiaries and the communities in which the sites were located.

94.     Brooks' appointment of hand-picked employees to her Multistate Trust Leadership Team was one of several benefits Brooks bestowed on her loyal employees as she maneuvered to freeze Weinreich out and take sole control of their major trust appointment.

95.     Brooks' implementation of the Leadership Team without Weinreich's consent directly contravened their agreement that all decisions impacting the Company and Multistate Trust would be made jointly by both of them.

### C. *Leadership Team Members Create Reorganization Plans at Brooks' Request.*

96.      Consistent with the recommendations of The Collaborative Way management consultants, Weinreich and Brooks scheduled a follow-up Company retreat for September 2018 in Denver.  Neither Brooks nor Weinreich were physically present at the retreat.

97.      On information and belief, Brooks and others within the Leadership Team used the September 2018 Denver retreat to lay the foundation to oust Weinreich from the Company.

98.      On information and belief, at Brooks' request, Tasha Lewis ("Lewis") and Elliott (members of the Leadership Team), unbeknownst to Weinreich, brought different proposed reorganization plans to the Denver retreat.

99.      The substance and existence of the plans were not disclosed or discussed with Weinreich prior to the meeting.

100.      On information and belief, Lewis and Elliot asked employees at the Denver retreat to review both plans and the employees approved showing the plan prepared by Lewis (the "Reviewed Plan") to Weinreich and Brooks.  The Reviewed Plan showed the five existing Multistate Trust director-level roles being removed from the Multistate Trust and inserted into the Company.  The effect of this change would be to give director level employees a significant management and control role within the parent Company, as opposed to only having a management and control role within the Multistate Trust.

101.      The Reviewed Plan also showed all employees, including the directors, reporting directly and indirectly to both Weinreich and Brooks.  In this regard, the Reviewed Plan was substantially similar to every prior iteration of the Company's organization chart and reporting structure for the Multistate Trust, with Brooks and Weinreich appearing at the top of the chart and all Company employees reporting to them.

102.     Weinreich first became aware of the Reviewed Plan when he later received a copy of what he was led to believe was that plan, but was not.  Though labeled "Presented to us in Denver Organizational Recommendations," the reorganization plan Weinreich received was not the Reviewed Plan that employees at the retreat had approved showing to Weinreich and Brooks, but was instead a different version of the plan that, on information and belief, had been altered by employees, including Gorton, in consultation with Brooks (the "Altered Plan").

103.     The Altered Plan differed significantly from the Reviewed Plan in two respects. First, the employees serving as directors were moved from positions of directors of the parent Company to directors only of the subsidiary trusts.  Second, no employee in the Multistate Trust or the Company reported to or had any line of communication to Weinreich.  Instead, all employees reported solely to Brooks, either directly or indirectly through directors to Brooks.

104.     Once Weinreich had seen both the Reviewed Plan and the Altered Plan, Weinreich was willing to consider the Reviewed Plan in order to bring employees into a management role within the Company since it could support founder succession planning. Brooks, however, adamantly opposed the Reviewed Plan, telling Weinreich that she did not want employees involved in Company management which, unbeknownst to Weinreich at the time, she was plotting to control unilaterally.

**VII.     Brooks Seeks a Dramatically Greater Share of Revenue at the End of 2018.**

105.     Weinreich was unaware of Brooks' resentment or the implementation of her developing scheme to force him out, but gradually became aware of the depth of the rift between them at the end of 2018.

106.     Consistent with his justified expectations, historically, Brooks and Weinreich worked together to agree on an end-of-year bonus for Brooks before distributing the Company's

24

profits according to their 51%/49% ownership interests, as modified by any re-allocation they made at the time, to result in a split of the Company's total end-of-year unallocated revenue between Brooks and Weinreich of roughly 55% to 45% respectively.

107.     At the end of 2018, in a complete departure from his justified expectations and the Company's past procedures, during their discussions regarding the distribution of the Company's unallocated revenue, including her bonus, Brooks demanded they disregard their 51%/49% equity split entirely and that her final distribution of unallocated revenue be dramatically increased and that the increased ratio be retroactive to the beginning of the year.

108.     Weinreich had already spent the entire year working in reasonable reliance and with the justified expectation that he would be compensated consistently with their equity, their agreement, and past conduct.

109.     In response to Brooks' self-dealing and self-interested demand, Weinreich proposed that they discuss and try reach a resolution collaboratively in the spirit of their decades' long business partnership.  When Brooks realized that Weinreich would not simply agree to her demand, she proceeded to refine and rollout her plan to freeze-out Weinreich.

**VIII.     <u>Brooks' Pretext for the "Reorganization."</u>**

110.     Although her story has changed over time, in an effort to explain and justify her decision to reorganize the governance structure of the Company, in December 2018, Brooks claimed vaguely that she had been approached in confidence by five employees who alleged that Weinreich had created a hostile work environment.  Without offering any substantiating evidence, Brooks claimed to be extremely concerned about these complaints.

111.     Weinreich was blindsided when he heard about the alleged employee complaints. He could think of no interaction or basis that would prompt any employee, let alone multiple

employees, to complain that he had engaged in any improper conduct that could lead to a claim against the Company, against him, or otherwise.

112.    Weinreich immediately urged Brooks to follow past Company practices to use outside qualified investigators to conduct an independent investigation of the employee allegations, as the Company had done in 2011 when former employee Voss alleged that Brooks had engaged in inappropriate conduct with her.

113.    Despite Weinreich's repeated requests that Brooks initiate an independent investigation, in violation of duties she owed to Weinreich, Brooks consistently and categorically refused to initiate such an investigation or otherwise follow how the Company had previously handled employee complaints.

114.    Brooks also did not notify the Company's EPL insurance—obtained as a result of the 2011 lawsuit generated by Brooks' conduct—of her purported concerns.

115.    With one exception, Brooks also refused to provide Weinreich with any specific information or substantiating evidence concerning the allegations or the alleged incidents that serve as their basis.

116.    The one exception concerned statements allegedly obtained by Brooks from a former employee, David Schnakenberg ("Schnakenberg"), during an exit interview conducted by Dabney and Vanderhook-Gomez.

117.    The Schnakenberg exit interview is the first and on information and belief only exit interview ever conducted by the Company and the sole purpose of the exit interview was to extract negative comments about Weinreich.

118.    During the interview, Vanderhook-Gomez and Dabney falsely represented to Schnakenberg that anything he said would be kept confidential and off-the-record.  Vanderhook-

Gomez then asked leading questions and pressed Schnakenberg to make negative comments about Weinreich.  Thereafter, Brooks, in bad faith, disparaged Weinreich by falsely stating and writing to Weinreich and others that Schnakenberg (and others) said he quit because of Weinreich.

119.    In fact, Schnakenberg never said he quit because of Weinreich.  Rather, he explained that he had the most serious problems with Brooks because of her lack of guidance and poor communication.  Because the so-called exit interview was conducted as a pretext to gather dirt on Weinreich, Schnakenberg's negative comments about Brooks were ignored.  Instead, Brooks used Schnakenberg to cast statements in a false light about Weinreich to further her scheme to force him out of the Company.

120.    With respect to the other allegedly complaining employees, Brooks claimed that she could not provide any information because the employees were supposedly concerned about retaliation from Weinreich—even as Brooks had already begun to freeze Weinreich out through her issuance of multiple versions of her reorganization plan.

121.    Brooks' refusal to provide any details about the alleged complaints is noteworthy and indicative of their baselessness.  The Company is a 100% virtual company with all twenty-five of its then employees working out of their home offices in various states.  As a consequence, almost all of the interactions between Company employees, including Weinreich, were virtual.  They occurred through periodic project team emails, calls, and video conferencing.  Thus, there was minimal opportunity for unmonitored intimidation or retaliation in the "workplace."

122.    Rather, Brooks used the anonymous and unsubstantiated (and, on information and belief partially or fully fabricated) employee complaints as a pretext to gaslight and force Weinreich out of the Company.

123.     Tellingly, the only "remedy" acceptable to Brooks to address the anonymous workplace complaints was to strip Weinreich of his position as Co-Managing Principal of the Multistate Trust (the Company's largest trust appointment), reassign his responsibilities to her friends and those who had previously reported to Weinreich, and ultimately force him out of the Company.

124.     This was motivated by animus, not in the best interests of the Company, a breach of the fiduciary duties of utmost good faith and loyalty owed by the majority shareholder to the minority shareholder, a breach of the fiduciary duties of utmost good faith and loyalty owed by a Director to a shareholder, and not the least harmful means of addressing any legitimate concern. Indeed, if Brooks' allegations about Weinreich were true, which they are not, Brooks had a range of alternative, less punitive, and more industry traditional measures before her, such as initiating an independent investigation of the claims, providing employee training, using The Collaborative Way facilitators (already known to employees) who were consulted and offered to privately meet with employees, seeking guidance from the Company's EPL carrier, and implementing formal written Company protocols for employee complaints.

**IX.    Brooks' July 1, 2019 "Reorganization" Plan.**

125.     Between January 1, 2019 and July 1, 2019, Brooks issued multiple iterations of her Multistate Trust Reorganization Plan, which she attributed in principle to the Denver retreat and the employees (the "Brooks Plan"). Brooks' iterations shared the common feature of terminating Weinreich's long-standing Multistate Trust co-governance, co-management, and co-leadership roles.

126.     Brooks periodically sought comments from Weinreich on the Brooks Plan in a transparent attempt to pressure him to approve by conduct or otherwise her freeze-out of him. Weinreich did not approve the Brooks Plan and expressly objected to it.

127.     On July 1, 2019, without first procuring the Board of Directors' approval, and over Weinreich's objections, Brooks implemented the Brooks Plan by, among other things, distributing it to all Company employees.

128.     Among other things, the Brooks Plan removed Weinreich as the Co-Managing Principal of the Company's major and most significant business project, the Multistate Trust.  By implementing the Brooks Plan and distributing it to all employees, Brooks demoted and publicly removed Weinreich from his decade-long Co-Managing Principal role of the Multistate Trust.

129.     Rather than bring her proposal for reorganization to the Company's Board of Directors for a vote, Brooks, in bad faith and in violation of the Company's Bylaws, unilaterally proclaimed the effectiveness of her restructuring on July 1, 2019.

130.     Brooks sought to cover-up her bad faith actions by electing her long-time friend and newly promoted Chief Operating Officer of the Multistate Trust, Dabney, to the Board as a third member to retroactively ratify the Brooks Plan.

131.     The appointment of Dabney as Director of the Company and the Chief Operating Officer of the Multistate Trust and were in violation of the Bylaws and the fiduciary duty of utmost good faith and loyalty Brooks owed to Weinreich.

132.     The creation of the position of Chief Operating Officer was also in violation of the duties of good faith and preservation of trust assets the Company owed to the Multistate Trust.

133.    Dabney's participation in these efforts, including those to retroactively ratify the Brooks Plan, constituted impermissible self-dealing and were in violation of the fiduciary duty of utmost good faith and loyalty he owed to shareholder Weinreich.

134.    The Brooks Plan that was distributed publicly to all of the employees constituted written notice to Weinreich that the Company had fired him from the Co-Managing Principal job he held for almost a decade for the Multistate Trust.

135.    Over Weinreich's objections and in an act intended to humiliate, silence, retaliate against, and undermine him in front of the Company's employees, Brooks re-assigned virtually all of Weinreich's responsibilities and duties as Co-Managing Principal of the Multistate Trust to his former subordinates and direct reports.

136.    This "restructuring" and reassignment of virtually all of Weinreich's duties relegated him to the status of mere employee of the Company subordinate to Brooks and actually and constructively terminated him from the management position he had held for twenty years.

137.    The Brooks Plan transferred Weinreich's responsibilities to a select group of employees, including Gorton, as well as to her designated successors to Weinreich, Dabney and Vanderhook-Gomez.  These employees were chosen because of their loyalty to Brooks and in furtherance of her scheme to freeze Weinreich out of the management of the Company.

138.    The purpose of the Brooks Plan was to strip Weinreich of his position as an Officer of the Company, remove his managerial responsibilities, and concentrate all executive power and control solely in Brooks.

139.    These actions were intended to, and did, deprive Weinreich of his reasonable expectations as a shareholder, as well as an employee, of a company he co-founded.

140.     Notably, the Brooks Plan greatly increased Brooks' roles, responsibilities, and control of the Company to the detriment of the Company, as Brooks was unable to keep up with her own responsibilities when Weinreich co-managed the company.

141.     On information and belief, Brooks and the others with whom she met to carry out this freeze-out plan billed the time they spent meeting to carry out this plan to the Multistate Trust in violation of their duties to the Trust and the detriment of the Company.

**X.     Further Efforts to Reduce Weinreich's Roles and Responsibilities.**

142.     Brooks also took steps to prevent Weinreich from communicating with Company employees and outside third parties, including, without limitation, the beneficiaries of the Multistate Trust who had come to depend on Weinreich and to whom Brooks owed a fiduciary duty, again to the detriment of the Company and the beneficiaries of the Multistate Trust.

143.     Just a few weeks after she implemented the Brooks Plan over Weinreich's objections, Brooks completed her strategy of forcing Weinreich out by ordering him in writing not to speak with Company employees or to outside third parties, including, without limitation, the attorneys within the United States Department of Justice for whom Weinreich had been a primary point of contact for over ten years.

144.     On information and belief, this was further intended to prevent Weinreich from communicating his concerns to others about Brooks' mismanagement and fiduciary opportunism.

145.     In mid-August 2019, Brooks sent an email to Weinreich in which she ordered him "to direct all communications (emails, phone calls, etc.) that pertain to any and all Multistate Trust legal, financial, property-related and community relations to David Dabney with a copy to me.  You are no longer authorized to communicate directly with the members of the functional

and operations group (i.e., legal, financial, real estate and communications) . . . you cannot initiate any communications with any of *our employees* unless and until I have authorized such communications."  (emphasis added).

146.    The next day, Brooks issued a call for a Special Meeting of the Stockholders for the specific purpose of removing Weinreich from the Board and to decrease the number of Directors from three to two, thereby further concentrating her majority shareholder control of the Company's Board, limiting the Board to herself and Dabney (who had just been promoted to take over many of Weinreich's management roles and responsibilities) and seeking to further oppress Weinreich.

147.    After Weinreich cautioned Brooks that removing him from the Board would be a blatant act of oppression, she temporarily postponed the special meeting.  But she ultimately removed him from the Board.

148.     Further, after implementing her Plan, Brooks declared Weinreich never to have been a "Co-Founder" of the Company and intentionally deleted him as a "Co-Founder" on the Company's website.

**XI.    Brooks and the Company Withhold Distributions and Records From Weinreich.**

149.    After Weinreich's discharge, Brooks and the Company failed to pay Weinreich the amount of Company profits owed to him in 2019 and a portion of 2020.

150.    Brooks refused to divide the Company's profits with Weinreich consistent with his pro rata share and their agreement.

151.    For 2019, Weinreich was paid less than a third of what he had received from the Company in 2018.

152.    In addition, despite his status as a shareholder through September 30, 2020, Brooks withheld all distributions allocable to him through such date.

153.    As a 49% shareholder of the Company until September 2020, Weinreich repeatedly requested access to the Company's financial records as is his right as a shareholder and under applicable state law.

154.    The Company repeatedly and steadfastly refused to make any financial information available to Weinreich without placing unreasonable restrictions on such access.

**XII.    Constructive and Actual Discharge.**

155.    Brooks' decision to strip Weinreich of his Multistate Trust titles and responsibilities, her direction that he not initiate any communications to Company employees or third parties, her attempts to retroactively deprive Weinreich of a significant portion of his annual compensation, and her reassignment of virtually all of his Multistate Trust duties were the result of her desire for complete control of the Company (including her ability to create additional layers of billing in breach of her duties to the Multistate Trust), silence Weinreich, and freeze-out Weinreich as a shareholder, Officer, and Director.

156.    On information and belief, Brooks used unsubstantiated, manufactured, and/or exaggerated employee complaints against Weinreich as a pretext for her freeze-out scheme in violation of the fiduciary duties of utmost good faith and loyalty she owed to him as a minority shareholder and to frustrate his reasonable expectations of holding management positions in the Multistate Trust and the Company.

157.    Brooks had no good faith basis or grounds for demoting or removing Weinreich from his managements position within the Multistate Trust and Company or to deprive him of his position as Director on the Board.

158.     Brooks schemed to and froze Weinreich out of the management of the Company and Multistate Trust, transferred his life's work to his former subordinates, and undermined, actively sabotaged, and extinguished Weinreich's ability to perform the services for which he joined and built the Company.

159.     As a result of the actions as summarized above, Weinreich could no longer continue with the Company because his roles in the Company and Multistate Trust had been so curtailed and working conditions made so intolerable that he had been, effectively, constructively discharged.

160.     Eventually, after being stripped of his roles and responsibilities, Weinreich acknowledged to a few select employees that he was no longer with the Company.  Upon learning of Weinreich's acknowledgement, Brooks misrepresented to all employees that Weinreich resigned from the Company.

### XIII.    Brooks and the Company Continue to Oppress Weinreich After His Termination, Including Deflating the Value of His Shares.

161.     On or about July 7, 2019, Weinreich issued the Company a written Notice of Sale, triggering the Company's right of first refusal to purchase his shares pursuant to Article V of the Articles of Organization.

162.     In essence, Article V provides that the Company has the right to trigger a valuation (termed an "arbitration" in the Articles) of the shares if the selling shareholder and the Company cannot agree on a price.  The selling shareholder appoints an "arbitrator."  The Company appoints an "arbitrator."  If the two arbitrators cannot agree, they appoint a third.  The three meet together.  If all three cannot agree, the valuation of the third controls.

163.     Instead of discussing Weinreich's notice at a formal Board meeting (complete with a record of minutes), Brooks did not hold a meeting but instead responded unilaterally.

34

164.    The right of first refusal process and the written agreement reached by the parties as to how the valuation would proceed (the "Valuation Agreement") set forth in relevant part that:

    a.  "Both stockholders and their arbitrators expect this process to be open and collaborative."

    b.  After the initial arbitrators arrive at a valuation and exchange them "[t]he parties will have 7-days to review the valuations."

    c.  All three arbitrators will meet within 14 days of the third arbitrator's receipt of the valuation and will, "[d]uring that meeting . . . determine the valuation."

    d.  If all three arbitrators cannot agree, the third arbitrator will determine the value and communicate it to the parties "by email including supporting analysis."

165.    Instead of participating in the valuation process in good faith and in a manner consistent with the obligations under the Articles of Organization and the Valuation Agreement in a manner which was "open and collaborative," Brooks ordered that none of the information provided to the arbitrators by the Company, and that formed the financial basis for the valuation, be shared with Weinreich.

166.    Weinreich was not permitted to see any of the financial data which led to the computation of the final valuation, nor was he permitted by Brooks to see the analysis for the final valuations because they relied upon the information the Company provided.

167.    Brooks and the Company effectively and actually deprived Weinreich of his right to personally participate in the valuation process or to respond to the information provided by the Company.

168.    Conversely, on information and belief, Brooks reviewed in detail data and analysis provided by the three arbitrators and made detailed critiques and adjustments to documentation in order to influence the final valuation.

169.    On information and belief, the information provided by the Company to the arbitrators was so incomplete, false, or inaccurate as to result in the valuation being dramatically less than the fair value of his shares.

170.    Alternatively, Brooks has so grossly mismanaged the Company that its value has dropped from the $19 million it was independently appraised at in March 2019 to a value, only months later, of $3,777,288 for Weinreich's 49% interest in the Company, as valued by the third arbitrator.

171.    Both before and after Weinreich's termination, Brooks and Dabney have taken measures to further their own interests to the detriment of the Company and its profits and in violation of the duties they owe to Weinreich, exposing the Company and its Directors to unnecessary liability and taking actions to diminish its profits such as by paying excessive bonuses such that Weinreich was deprived of his reasonable expectation of an equal return on his investment.

172.    On information and belief, in violation of their fiduciary obligations of utmost good faith and loyalty to Weinreich, Brooks and Dabney have paid their legal fees from the Company's funds, diminishing the profits to which Weinreich is entitled.

XIV.    **Brooks and the Company Force Weinreich to Sell His Shares.**

173.    After his termination and Brooks, Dabney, and the Company's manipulation of the valuation process, their refusal to pay Weinreich for his continued ownership interest, and their ongoing threats to sue Weinreich if he ever again tried to work in his trust field as long as he was a shareholder of the Company, Weinreich was forced to sell his shares at a price well below their value.

174.    Weinreich is entitled to recover the difference between the price he received after being forced to sell his shares and the value of those shares as appraised through an independent process in March 2019, before Brooks, Dabney, and the Company improperly influenced and manipulated the valuation process, or alternatively, grossly mismanaged the Company after terminating Weinreich so as to substantially reduce its value.

XV.     **Brooks Defames Weinreich and Irreparably Damages His Relationships with Beneficiaries and Ability to Work in His Chosen Field.**

175.    On information and belief, Brooks repeatedly disparaged Weinreich and lied to the Company employees and third parties about Weinreich by claiming, among other things, that he created a hostile work environment in order to justify the Brooks Plan and his ultimate termination and removal from the Company.

176.    On behalf of the Company, in his role as Co-Managing Principal of the Multistate Trust, Weinreich regularly interacted with and on many occasions led communications with the United States Department of Justice, the United States Attorney's Office, the United States Department of Environmental Protection Agency and with dozens of State Attorney Generals' offices and State departments of environmental protection throughout the country.

177.    Weinreich took great care in building and maintaining these relationships over many years.

178.    On information and belief, Brooks also repeatedly disparaged Weinreich and lied to the government beneficiaries and representatives of those beneficiaries about the reasons for Weinreich's departure from the Company and this lawsuit.

179.    For example, it has been reported to Weinreich that Brooks was "out to destroy" Weinreich's reputation and made untrue and false statements about him to that end.

180.    Brooks also published untrue and false statements about Weinreich in one or more emails.

181.    Brooks' disparagement of Weinreich and the lies told to these third parties about him, the reason for his departure from the Company, and this lawsuit, has irreparably damaged these relationships and his credibility and reputation in the trust field.

182.    Due to the damage caused by Brooks' disparagement and lies, Weinreich has been unable to secure any trust appointments or otherwise work in his chosen field.

183.    On information and belief, in September 2020, the United States rejected Weinreich from a trust appointment in the *Exide Holdings, Inc., et. al.*, Case No. 20-11157 (CSS) bankruptcy matter in the U.S. Bankruptcy Court for the District of Delaware, at least in part, because of untrue and false statements Brooks made about him to the United States.

## COUNT I – BREACH OF FIDUCIARY DUTY/FREEZE-OUT
### (Defendant Cynthia Brooks)

184.    Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

185.    At all times relevant to the allegations herein, Weinreich held a 49% ownership interest in the Company and was the Company's minority shareholder.

186.    At all times relevant to the allegations herein, Brooks held a 51% ownership interest in the Company and was the Company's majority shareholder.

187.    At all times relevant to the allegations herein, Brooks was a Director of the Company.

188.    The Company is organized under the laws of the Commonwealth of Massachusetts, has a principal office in the Commonwealth of Massachusetts, and regularly conducts business in the Commonwealth of Massachusetts.

189.    The Company is a Massachusetts closely held corporation with a small number of shareholders, no ready market for corporate stock, and substantial majority shareholder participation in the management, direction, and operations of the corporation.

190.    At all times relevant to the allegations herein, Brooks, as the majority shareholder of the Company, owed Weinreich, the minority shareholder, a fiduciary duty of utmost good faith and loyalty.  This heightened fiduciary duty prohibits majority shareholders in a closely held corporation from acting out of avarice, expediency, or self-interest in derogation of their duty of loyalty to the other shareholders.

191.    At all times relevant to the allegations herein, as a Director of the Company, a closely held corporation, Brooks owed a fiduciary duty of utmost good faith and loyalty to Weinreich, a shareholder of the Company.

192.    Weinreich had a reasonable expectation of benefits as a shareholder in the Company.

193.    As co-founder, co-owner, Director, and Officer of the Company for almost twenty years, Weinreich had a reasonable expectation he would continue to be employed by the Company until his voluntary retirement; involved in the management of the Company and its trust appointments; receive the benefits of his ownership of, and investment in, the Company; that he and Brooks would treat each other equally and fairly, placing the interests of the other

above or at least equal to their own interests; that he would continue to participate in the governance and leadership of the Company and its trust appointments as an Officer, Director, and employee; that Brooks would not direct the Company to withhold 2019 and 2020 distributions due Weinreich; that Brooks would not dominate and control the valuation process and allow the Company to act unfairly and deceptively throughout the process and otherwise falsely interfere with Weinreich's ability to obtain fair value for his ownership interest; that he would be given access to the books and records of the Company; and that Brooks would not interfere with any of these rights.

194.    Through her actions detailed above, Brooks acted in bad faith and in derogation of her duty of loyalty, thereby breaching the fiduciary duty of utmost good faith and loyalty she owed Weinreich.

195.    As a direct result of Brooks' conduct, Weinreich was frozen out of the Company, was denied his almost twenty year leadership and governance role in the Company through Brooks' restructuring of the Multistate Trust, was terminated, was excluded from critical Company meetings, was slandered, defamed, and falsely accused of wrong-doing so as to position him to be frozen out of the Company and interfere with his ability to ever work again in the trust field, was prevented from talking with employees and government beneficiaries, was denied access to corporate books and records, was denied distributions owed to him, and was forced to sell his shares at a severely deflated price in an unfair valuation process.

196.    No legitimate business purpose existed for Brooks' actions and freeze-out of Weinreich.

197.    As a direct and proximate result of Brooks' breach of the fiduciary duty and obligations she owed Weinreich, Weinreich has suffered substantial economic damages,

including but not limited to loss of salary, benefits, and distributions, diminution in the value of his shares, and attorney's fees and expenses.

198.     Weinreich is entitled to an award of damages in an amount to be determined at trial.

## COUNT II – BREACH OF EMPLOYMENT CONTRACTS
### (Defendant Greenfield Environmental Trust Group, Inc.)

199.     Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

200.     Weinreich had valid and enforceable implied and oral contracts of employment with the Company.

201.     These contracts of employment were supported by consideration.

202.     Those contracts guaranteed Weinreich employment as a managerial and supervisory officer of the Company and of the Multistate Trust, including management responsibility and key decision-making authority until his voluntary retirement.

203.     Those contracts also promised that Weinreich's total annual payments (including base, benefits, and profits) would be roughly consistent with his shareholder status through retirement.

204.     At all times relevant to the allegations herein, Weinreich was ready, willing, and able to perform all of his obligations under those contracts and did satisfactorily perform all of said obligations.

205.     The Company breached those contracts by, among other things, actually and constructively terminating him, including, without limitation, by demoting and removing Weinreich, by assigning his roles and responsibilities to his subordinates and direct reports, by

prohibiting him from talking to Company employees and trust beneficiaries, by refusing to compensate him as agreed upon, and by functionally isolating him within the Company.

206.    Weinreich is entitled to an award of damages in an amount to be determined at trial.

### COUNT III – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (EMPLOYMENT CONTRACTS)
#### (Defendant Greenfield Environmental Trust Group, Inc.)

207.    Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

208.    Inherent in every Massachusetts contract is an implied duty that the parties to such contract will conduct themselves in good faith and with fair dealing.

209.    Weinreich's contracts for employment with the Company were Massachusetts contracts that therefore contained such an implied duty of good faith and fair dealing.

210.    By the conduct described herein, the Company breached its obligations to act in good faith and with fair dealing towards Weinreich in the discharge of its respective duties under Weinreich's employment contracts.

211.    The Company actually and constructively terminated Weinreich without good cause and deprived him of compensation owed to him in 2019 and 2020.

212.    Because of the numerous acts described above, the Company has breached the implied covenant of good faith and fair dealing in the employment contracts it has with Weinreich, causing substantial economic injury to Weinreich, including but not limited to the loss of substantial compensation that he is owed.

213.    Weinreich is entitled to an award of damages in an amount to be determined at trial.

## COUNT IV – PROMISSORY ESTOPPEL
### (Defendants Cynthia Brooks and Greenfield Environmental Trust Group, Inc.)

214.    Brooks and the Company represented to Weinreich that he would be guaranteed employment as a managerial and supervisory officer of the Company and of the Multistate Trust, including management responsibility and key decision-making authority until his voluntary retirement.

215.    Brooks and the Company also represented to Weinreich that he would receive the long-term return on his substantial professional investment through his shareholder distributions and compensation in amounts roughly proportionate to his share of ownership interest through retirement, and thereafter if the Company continued operations or was sold.

216.    In making these representations, Brooks and the Company intended that Weinreich rely on them.

217.    Weinreich reasonably relied on these representations, which were made when Brooks and Weinreich founded the Company and were its only employees and shareholders.

218.     In reasonable reliance on these representations, Weinreich invested his entire career and his substantial professional skill, judgment, and experience in building the Company.

219.     In so doing, Weinreich gave up numerous other professional and financially rewarding opportunities initially and over time to devote himself to building the Company.

220.    Weinreich suffered a substantial detriment when Brooks and the Company broke their promises to him and forced him out of the Company.  Weinreich has lost out on salary, benefits, and distributions, among other things.

221.    Weinreich also has been forced out of his chosen field and profession.

222.    Weinreich is entitled to an award of damages in an amount to be determined at trial.

## COUNT V – WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (Defendant Greenfield Environmental Trust Group, Inc.)

223.    Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

224.    At all relevant times, Weinreich was an employee of the Company.

225.    Massachusetts law protects employees who are terminated for performing important public deeds.

226.    On information and belief, Weinreich was frozen out of the Company through the Brooks Plan and terminated from his employment with the Company for improper reasons unrelated to his performance, including without limitation, that Brooks wanted to silence Weinreich so that Brooks' possible instances of fiduciary opportunism would not be brought to the attention of or scrutinized by the United States or the other government beneficiaries.

227.    Some of the issues Weinreich flagged have substantial, well-defined, important public policy and national consequences, especially as they relate to fiduciary duties owed to the government and issues of environmental justice.

228.    The beneficiaries of the Company's actions are federal and state governmental entities.

229.     Company employees, through its wholly owned subsidiary trustees, perform all employment-related services for the trustees for the direct benefit of such federal and state governments.

230.    In such capacity, Company employees, including, without limitation, especially Weinreich as Co-Managing Principal of the Multistate Trust at the time, have direct fiduciary duties to the governments.

231.    The concerns raised by Weinreich were more than matters of internal administration, policy, or organizational functioning.

232.    The matters touched and concerned how substantial funds extracted from industry by federal and state government attorneys for the public good that were entrusted to the Company were being used by the Company and what decisions the Company was making about those funds that would affect communities around the country, including environmental justice communities.

233.    Weinreich's high duty to his Company meant that he had an even higher duty to the government beneficiaries for whom he and his Company were fiduciaries.

234.    The fact that Brooks and the Company were trying to silence him is clear from Brooks' August 14, 2019 email in which she ordered him cease all communications with Company employees and trust beneficiaries and representatives.

235.    The Company's conduct in wrongfully terminating Weinreich's employment in violation of public policy has caused Weinreich substantial economic harm, including but not limited to loss of salary, benefits, and distributions, and attorney's fees and costs.

236.    Weinreich is entitled to an award of damages in an amount to be determined at trial.

## COUNT VI – BREACH OF CORPORATE BYLAWS
### (Defendants Cynthia Brooks, David Dabney, and Greenfield Environmental Trust Group, Inc.)

237.    Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

238.    The Bylaws constituted a valid and binding agreement between the Company and its shareholders and Directors (including Brooks and Dabney) as to how the Company would operate.

239.    The Bylaws were supported by consideration.

240.    At all times relevant to the allegations made herein, Weinreich was ready, willing, and able to perform under the Bylaws and in fact performed all such obligations under the Bylaws.

241.    Brooks and Dabney, purportedly acting for the Company, breached their obligations to Weinreich under the Bylaws, including, without limitation, in each of the following ways:

a.    Brooks and Dabney did not hold an annual meeting of the stockholders within six months of the end of the 2019 fiscal year in violation of Article III.

b.    Beginning on or around October 1, 2019, Brooks and Dabney did not provide appropriate written notice of stockholder or Board of Director's meetings in violation of Articles V and XII and/or they did not hold Director's meetings on matters affecting the Company, including without limitation, the valuation process.

c.    Brooks did not appropriately elect Dabney to Board of Directors and she and Dabney prematurely removed Weinreich from the Board of Directors in violation of Article IX and XX.

    d.   Brooks unilaterally and without following appropriate procedures appointed officers and prematurely removed Weinreich as an officer in violation of Article XIV.

242.    None of this conduct was done in good faith or with the reasonable belief that it was in the best interests of the Company.

243.    Weinreich has been damaged by these breaches of the Bylaws in an amount to be determined at trial.

## COUNT VII – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CORPORATE BYLAWS)
### (Defendants Cynthia Brooks, David Dabney, and Greenfield Environmental Trust Group, Inc.)

244.    Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

245.    Inherent in every Massachusetts contract is an implied duty that the parties to such contract will conduct themselves in good faith and with fair dealing.

246.    The Company's Bylaws are a Massachusetts contract that therefore contained such an implied duty of good faith and fair dealing.

247.    Brooks and/or Dabney, purportedly acting on behalf of the Company, breached the covenant of good faith and fair dealing implied within the Bylaws, including by unilaterally removing Weinreich as a Director of the Board, appointing another Director of the Board to dilute his voting rights, and removing him as an Officer in contravention of his justified expectations.

248.    None of this conduct was done in good faith or with the reasonable belief that it was in the best interests of the Company.

249. Weinreich has been damaged by these breaches of implied covenant of good faith and fair dealing implied within the Bylaws in an amount to be determined at trial.

### COUNT VIII – BREACH OF ARTICLES OF ORGANIZATION AND VALUATION AGREEMENT
### (Defendants Cynthia Brooks, David Dabney, and Greenfield Environmental Trust Group, Inc.)

250. Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

251. The Company's Articles of Organization, which contain the Right of First Refusal and obligation to provide corporate books and records to shareholders, and the Valuation Agreement constituted valid and enforceable agreements between the Company, the Board of Directors (including Brooks and Dabney), and Weinreich.

252. These Agreements were supported by consideration.

253. At all times relevant to the allegations made herein, Weinreich was ready, willing, and able to perform under those Agreements and in fact performed all such obligations under said Agreements.

254. Brooks, Dabney, and the Company breached their obligations under the Right of First Refusal and Valuation Agreement, including, without limitation, by the following:

    a. On information and belief, failing to hold Board of Directors meetings, with accompanying minutes, to act on Weinreich's Notice of Sale, elect the Company's valuation arbitrator, and vote to purchase or not purchase the shares at the valuation.

    b. Failing to participate in a manner that was open and collaborative.

    c. Failing to allow Weinreich to participate in a meaningful way in a valuation process mandated by the Company in its Articles of Organization.

d.   Failing and refusing to disclose (or allow the arbitrators to disclose) at any and all times the financial materials supporting the valuation to Weinreich and to which Weinreich had an equitable and statutory right.

e.   Failing and refusing to provide (or allow the arbitrators to provide) the valuation analysis to Weinreich.

f.   On information and belief, submitting incomplete, inaccurate, and slanted financial data and memorandum with the intent to artificially depress the fair value of Weinreich's shares.

g.   Failing to follow the deadlines and providing additional materials beyond the deadline.

255.   The Company also had a statutory obligation under MASS. GEN. LAWS c. 156D, § 16.02 to allow Weinreich to examine its financial statements.  The Company's Articles of Organization further provide that Weinreich, as a shareholder, had a right to examine Company books and records unless reasonable grounds existed that such examination would be adverse to the interests of the Company and a vote of the Directors refusing permission would be prima facie evidence thereof.

256.   The Company breached its obligation to allow Weinreich to examine its books and records since the examination was required in the interest of fairness and due process for the Company's own Articles of Organization mandated right of first refusal process and, on information and belief, the Company allowed the decision to be made by self-interested shareholder Brooks, not the Company through its Directors.  Weinreich has been harmed by the foregoing conduct in the amount of the diminished value of his ownership interest and the

additional costs he incurred as a result of Brooks, Dabney, and the Company's intentional misconduct.

257.   Weinreich has been damaged by these breaches the Articles of Organization and Valuation Agreement in an amount to be determined at trial.

## COUNT IX – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (ARTICLES OF ORGANIZATION AND VALUATION AGREEMENT)
### (Defendants Cynthia Brooks, David Dabney, and Greenfield Environmental Trust Group, Inc.)

258.   Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

259.   Inherent in every Massachusetts contract is an implied duty that the parties to such contract will conduct themselves in good faith and with fair dealing.

260.   The Company's Articles of Organization and the Valuation Agreement are Massachusetts contracts and therefore contained such an implied duty of good faith and fair dealing.

261.   Brooks, Dabney and the Company breached the covenant of good faith and fair dealing implied in the Agreements by, among other items, failing to disclose relevant, contemporaneous offers; providing inaccurate, incomplete, misleading, or false information to the arbitrators; and purposely dragging out the valuation in order to put additional pressure on and increase the harm to Weinreich.

262.   Brooks, Dabney and the Company further breached the covenants by, among other things, threatening to sue Weinreich if he ever tried to work in the trust field again while he was a shareholder in order to force Weinreich to sell his shares for less than fair value.

263.     Weinreich has been damaged by these breaches of implied covenant of good faith and fair dealing implied within the Articles of Organization and Valuation Agreement in an amount to be determined at trial.

## COUNT X – BREACH OF FIDUCIARY DUTY
### (Defendant David Dabney)

264.     Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

265.     At all times relevant to the allegations herein, Weinreich held a 49% ownership interest in the Company and was the Company's minority shareholder.

266.     At all times relevant to the allegations herein, Dabney was a Director of the Company.

267.     The Company is a Massachusetts closely held corporation.

268.     At all times relevant to the allegations herein, as a Director of the Company, a closely held corporation, Dabney owed a fiduciary duty of utmost good faith and loyalty to Weinreich, a shareholder of the Company.

269.     As a shareholder, Weinreich had a reasonable expectation that Dabney, as a Director, would honor his high fiduciary duty of utmost good faith and loyalty to Weinreich; that Dabney would not conspire with or aid and abet Brooks in her freeze-out, breaches of contract, and tortious conduct against Weinreich; that Dabney would not direct the Company to withhold 2019 and 2020 distributions due Weinreich; that Dabney would participate actively in the Company's valuation process of Weinreich's shares and not allow the Company to act unfairly and deceptively; and that Dabney would not self-deal by forcing Weinreich out of the Multistate Trust so that Dabney could assume some of Weinreich's duties, gain status in the Company, and enrich himself at Weinreich's expense.

270.     Through his actions detailed above, among others, Dabney acted in bad faith and in derogation of his duty of loyalty, thereby breaching the fiduciary duty of utmost good faith and loyalty he owed Weinreich.

271.     As a direct result of Dabney's conduct, Weinreich was frozen out of the Company, was denied his almost twenty year leadership and governance role in the Company through Brooks' restructuring of the Multistate Trust, was terminated, was excluded from critical Company meetings, was slandered, defamed and falsely accused of wrong-doing so as to position him to be frozen out of the Company and interfere with his ability to ever work again in the trust field, was prevented from talking with employees and government beneficiaries, was denied access to corporate books and records, was denied distributions owed to him, and was forced to sell his shares at a severely deflated price in an unfair valuation process.

272.     No legitimate business purpose existed for Dabney's actions toward Weinreich.

273.     As a direct and proximate result of Dabney's breach of the fiduciary duty and obligations he owed Weinreich, Weinreich has suffered substantial economic damages, including but not limited to loss of salary, benefits, and distributions, diminution in the value of his shares, and attorney's fees and expenses.

274.     Weinreich has been damaged as a result of these breaches in an amount to be determined at trial.

### COUNT XI – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Defendants David Dabney and Does 1-3)**

275.     Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

276.     As the majority shareholder and a Director of the Company, Brooks owed

Weinreich, as a minority shareholder of the Company, a fiduciary duty of utmost good faith and

loyalty.

277.     Dabney owed the same fiduciary duty to Weinreich once he became a Director of

the Company.

278.     Brooks breached her fiduciary duty to Weinreich by, among other things, freezing

him out of the Company, which among other things included restructuring the Multistate Trust to

remove Weinreich from his long-standing leadership positions and role as Co-Managing

Principal of the Multistate Trust, stripping Weinreich of his long-standing positions as Director

and Officer of the Company, engineering or exaggerating employee complaints concerning

Weinreich as a pretext for the freeze-out and to assassinate Weinreich's character and reputation,

defaming and disparaging Weinreich to individuals inside and outside of the Company, and

otherwise frustrating his reasonable expectations as shareholder of the Company.

279.     Dabney knew that Brooks was taking concerted actions to freeze Weinreich out of

the Company.

280.     Prior to becoming a Director of the Company, Dabney acted knowingly and in

bad faith by participating in and substantially assisting and/or encouraging Brooks in breaching

her fiduciary duty to Weinreich and freezing him out of the Company through the conduct

described above, including by assisting in soliciting negative information on Weinreich to

support Brooks' freeze-out plan.

281.     Dabney also acted knowingly and in bad faith by participating in and substantially

assisting and/or encouraging Brooks in her scheme after becoming a Director of the Company to

a degree that Dabney could not reasonably be held to have acted in good faith.  Dabney engaged

in this conduct knowingly and in anticipation of obtaining personal benefits, including assuming certain of Weinreich's roles and responsibilities.

282.    After becoming a Director, Dabney breached his fiduciary duty to Weinreich by assisting Brooks in freezing Weinreich out of the Company, by among other things, retroactively ratifying the Brooks Plan restructuring the Multistate Trust.

283.    Other Company employees, including without limitation Does 1-3, knew that Brooks and/or Dabney were taking concerted actions to freeze Weinreich out of the Company, and knowingly participated in and substantially assisted both Brooks and Dabney in their breaches of fiduciary duty to Weinreich in exchange for personal benefits and rewards.

284.    A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused.

285.    Dabney and other Company employees, including without limitation Does 1-3, were generally aware of his or her role as part of the tortious activity at the time he or she provided the assistance.

286.    These actions caused Weinreich substantial economic harm, including but not limited to lost salary, benefits, and distributions, and attorney's fees and expenses.

287.    As a result of this conduct, Weinreich has been damaged in an amount to be determined at trial.

## <u>COUNT XII – CIVIL CONSPIRACY</u>
### (Defendants Cynthia Brooks, David Dabney, and Does 1-3)

288.    Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

289.     As the majority shareholder and a Director of the Company, Brooks owed Weinreich, as a minority shareholder of the Company, a fiduciary duty of utmost good faith and loyalty.

290.     Dabney owed the same fiduciary duty to Weinreich once he became a Director of the Company.

291.     By common design or agreement, acting jointly and in concert, and in furtherance of the conspiracy, Brooks, Dabney, and other Company employees, including without limitation Does 1-3, engaged in a concerted tortious action to freeze Weinreich out of the Company in exchange for substantial personal rewards and in complete disregard of Weinreich and his status as a minority shareholder, co-founder, Officer, and Director of the Company.

292.     Brooks breached her fiduciary duty to Weinreich by freezing him out of the Company, which among other things included restructuring the Multistate Trust to remove Weinreich from his long-standing leadership positions and role as Co-Managing Principal of the Multistate Trust, stripping Weinreich of his long-standing positions as Director and Officer of the Company, using engineered or exaggerated employee complaints concerning Weinreich as a pretext for the freeze-out and to assassinate Weinreich's character and reputation, and otherwise frustrating his reasonable expectations as shareholder of the Company.

293.     Dabney breached his fiduciary duty to Weinreich by assisting Brooks in freezing Weinreich out of the Company, by among other things, retroactively ratifying the Brooks Plan restructuring the Multistate Trust after he became a Director.

294.     Brooks and Dabney knew that their conduct toward Weinreich in freezing him out of the Company constituted a breach of their fiduciary duties to him.

295.     Dabney and other Company employees, including without limitation Does 1-3, knew that Brooks' conduct toward Weinreich in freezing him out of the Company constituted a breach of her fiduciary duties and obligations to Weinreich.

296.     Dabney substantially assisted Brooks in breaching her fiduciary duty to Weinreich and freezing him out of the Company through the conduct described in the Complaint, including without limitation, by assisting in soliciting negative information on Weinreich to support Brooks' freeze-out plan and retroactively ratifying the Brooks Plan restructuring the Multistate Trust.

297.     Dabney engaged in this conduct knowingly and in anticipation of obtaining personal benefits, including assuming certain of Weinreich's roles and responsibilities.

298.     Brooks and other Company employees, including without limitation Does 1-3, knew that Dabney's conduct toward Weinreich constituted a breach of his fiduciary duties and obligations to Weinreich.

299.     Brooks substantially assisted and encouraged Dabney in breaching his fiduciary duties to Weinreich, including without limitation, by installing him as a Director to retroactively ratify the Brooks Plan.

300.     Other Company employees, including without limitation Does 1-3, substantially assisted Brooks and/or Dabney in breaching their fiduciary duties to him and freezing him out of the Company in exchange for personal benefits and rewards, including taking Weinreich's responsibilities and benefits for themselves.

301.     As a direct and proximate result of these collective improper acts in furtherance of the conspiracy to freeze Weinreich out of the Company, Weinreich suffered substantial

economic damages, including but not limited to loss of salary, benefits, and distributions, and attorney's fees and expenses.

302.    Weinreich has been damaged in an amount to be determined at trial.

### COUNT XIII – TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONS
#### (Defendants Cynthia Brooks, David Dabney, and Does 1-3)

303.    Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

304.    Brooks, Dabney, and other Company employees, including without limitation Does 1-3, were aware of and knew of the existing business relationship between Weinreich and the Company, between Weinreich and the Multistate Trust, and between Weinreich and the third-party contacts with whom he oversaw certain Multistate Trust sites.

305.    Brooks, Dabney, and other Company employees, including without limitation Does 1-3, acting independently and also at their direction intentionally and improperly interfered with the foregoing relationships through the conduct alleged herein, including by intentionally agreeing and acting to assume, or arrange to have others assume, Weinreich's roles and duties in the Multistate Trust for their personal benefit, casting Weinreich in a false light in order to further their intention to injure Weinreich and interfere with his contractual relationships and financial expectations, and, on information and belief, defaming Weinreich and spreading misinformation and lies about him, including, without limitation, the reason for his departure and this lawsuit.

306.    Such interference was carried out without a legitimate business purpose and through improper means, including breaches of contractual and fiduciary duties and defamation.

307.    Such interreference was also carried out for improper motives, including a desire to harm Weinreich personally and professionally, including ensuring that he never worked in the trust field again.

308.    Brooks and Dabney's desire to destroy Weinreich professionally constitutes a spiteful and malignant purpose that is unrelated to any legitimate corporate interest of the Company.

309.    Weinreich has been damaged by the foregoing conduct in an amount to be determined at trial.

## COUNT XIV – DEFAMATION
### (Defendant Cynthia Brooks)

310.    Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

311.    Brooks made and/or published numerous statements verbally and in writing to people both inside and outside the Company about Weinreich, including, without limitation, to certain of the government beneficiaries.

312.    Brooks' statements were knowingly and intentionally false, untrue and calculated to harm Weinreich by, among other ways, justifying her freeze out of him and by discrediting and disparaging his credibility to the government beneficiaries so they would dismiss his concerns about the Company and never employ him again for environmental trust fiduciary services, thereby exposing him to hatred, ridicule, or contempt.

313.    Brooks' verbal and written statements were capable of damaging Weinreich's reputation in the community, and, in fact, did so, and, further caused Weinreich substantial economic harm, including, without limitation, the loss of future work in his field and attorney's fees and expenses.

314.     Weinreich has been damaged by Brooks' slander and libel in an amount to be determined at trial.

## COUNT XV – ACCOUNTING
### (Defendants Cynthia Brooks and David Dabney, and Greenfield Environmental Trust Group, Inc.)

315.     Weinreich hereby incorporates the foregoing paragraphs of this Complaint by reference, as if fully set forth herein.

316.     At all times relevant to the allegations herein, Weinreich was a 49% shareholder in the Company who had the right to demand an inspection of and receive a full accounting of the Company's finances and distributions to shareholders.

317.     At all times relevant to the allegations herein, Brooks, the majority 51% shareholder and Director of the Company, and Dabney, a Director of the Company, owed a fiduciary duty of utmost good faith and loyalty to Weinreich, the minority shareholder of the Company.

318.     The Company also owed Weinreich as a shareholder and employee a duty of good faith and fair dealing.

319.     After Weinreich's termination, Brooks, Dabney, and the Company failed to pay Weinreich the full amount of Company profits owed to him in 2019 and 2020.

320.     Weinreich repeatedly requested access to the Company's financial records, but those requests were denied by Brooks and/or Dabney, acting on behalf of the Company.

321.     Weinreich is entitled to a full accounting of the Company's finances and distributions to shareholders for 2019 and 2020 (through September 30).

## PRAYER FOR RELIEF

WHEREFORE, Weinreich prays for judgment and relief against Defendants as follows:

1.      For judgment in favor of Weinreich and against Defendants on each of Weinreich's claims;

2.      For the diminution in value suffered by Weinreich in the value of his shares as a result of the Defendants' actions;

3.      For an award of actual damages based on an accounting in the amount of distributions due but not paid to Weinreich;

4.      For an award of future salary and full employee benefits that Weinreich would have received if he had been able to remain a full-time employee through at least age 75;

5.      For an award of all other available damages, including general and consequential damages;

6.      For an award of punitive damages as permitted by law;

7.      For an award of pre-judgment and post-judgment interest on all applicable amounts;

8.      For an award of costs and attorney fees as permitted by law; and

9.      For such other and further relief as the Court may deem proper and just.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Weinreich hereby requests trial by jury of all claims and issues triable of right by a jury.

Respectfully submitted,

**MARC WEINREICH,**

By his attorneys,

*/s/ John E. (Jed) DeWick_____*

Lisa G. Arrowood (BBO No. 022330)
John E. (Jed) DeWick (BBO No. 654723)
William F. McGonigle (BB) No. 569490)
ARROWOOD LLP
10 Post Office Square
7th Flr., South
Boston, MA 02109
Tel: 617-849-6200
larrowood@arrowoodllp.com
jdewick@arrowoodllp.com
wmcgonigle@arrowoodllp.com

*-and-*

Jenifer L. Tomchak (*pro hac vice*)
Nicole A. Skolout (*pro hac vice*)
TOMCHAK SKOLOUT
10 West 100 South, Suite 700
Salt Lake City, UT 84101
(801) 831-4820

Dated: December 8, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) or sent by first-class mail to any persons presently indicated as non-registered participants on this date.

/s/ William F. McGonigle
William F. McGonigle (BBO# 569490)
December 8, 2021