UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARC WEINREICH, an individual;<br><br>   Plaintiff,<br><br>v.<br><br>CYNTHIA BROOKS, an individual; GREENFIELD ENVIRONMENTAL TRUST GROUP, INC.; and DAVID DABNEY, an individual; and DOES 1-3;<br><br>   Defendants. | Case No. 1:21-cv-10496-NMG |

**PLAINTIFF MARC WEINREICH'S MEMORANDUM IN OPPOSITION TO
GREENFIELD ENVIRONMENTAL TRUST GROUP, INC.'S MOTION TO COMPEL**

**INTRODUCTION**

In April 2019, as Defendant Cynthia Brooks' ("Brooks") efforts to freeze plaintiff Marc Weinreich ("Weinreich") out of the business that he co-founded and built with her over almost 20 years escalated, Weinreich retained attorneys to advise and represent him. From April to June 2019 Weinreich communicated extensively with his attorneys using his company-issued email address. These communications are highly sensitive and are entitled to protection under the attorney-client privilege. Defendant Greenfield Environmental Trust Group, Inc. ("Greenfield" or the "Company") seeks to compel these privileged emails, arguing that Weinreich had no expectation of privacy in using his company-issued email address. As the relevant caselaw demonstrates, however, the mere fact that one uses a company-issued email for personal communications does not destroy the expectation of privacy. The analysis is particularized and based on the reasonable understanding and expectation of the user as determined by the given company's policies and practices with respect to its email system. As is set forth in greater detail

1

below and in the accompanying Declaration of Marc Weinreich, Weinreich had every expectation that the emails in question were private. As co-founder, 49% owner, and the partner largely responsible for running the operations side of the Company, Weinreich oversaw the IT functions of the Company, including developing policies applicable to the email system. The Company understood that employees would use the email system for personal purposes and did not prohibit such use. The Company did not monitor or inspect its employees' email, including and particularly their personal email. Importantly, as the partner overseeing IT functions Weinreich understood that no one at the Company could access his email without his knowledge or permission. He would not have communicated with his attorneys using this email address if he did not reasonably believe at the time that the communications were private. Thus, the confidentiality element of the attorney-client privilege is satisfied.

Further, Greenfield's argument that Weinreich's inclusion of his long-time domestic life partner, Joanna Pincus, on some of these communications waives the privilege also fails. As is explained in detail below, though technically not married, the nature of Weinreich and Pincus' long-time relationship is of like kind. They are each other's confidant and support system. Weinreich was going through an extremely complex and traumatic personal and professional crisis during this time, and Pincus' guidance and support was essential to him. Pincus was included in some of the emails in question in order to provide that essential guidance and support to him. As is set forth below, relevant case law recognizes that including close family members providing this type of support and guidance in communications with counsel is natural and expected, and their involvement does not vitiate the attorney-client privilege.

For the reasons set forth in detail below, Greenfield's Motion to Compel should be denied, and this Court should order that the attorney-client privileged emails currently in Greenfield's possession should be returned to Weinreich and all copies destroyed.

## RELEVANT BACKGROUND

Weinreich was the co-founder, 49% owner, Vice President, and Director of Greenfield for nearly 20 years. He built and ran the Company as a two-shareholder Massachusetts close corporation, with his former partner, Brooks, until she froze him out and seized control for herself in 2019 as described in the First Amended Complaint. (*See generally* Doc. No. 121.)

**I.      The Attorney-Client Communications in Question**

In the spring of 2019, Weinreich became increasingly concerned regarding an escalating disagreement between himself and defendant Brooks regarding the direction and control of the Company, and more specifically, Brooks' increasing efforts to marginalize and potentially force Weinreich out. (*See* Declaration of Marc Weinreich in Support of Opposition to Greenfield Environmental Trust Group, Inc.'s Motion to Compel ("Weinreich Decl."), ¶ 3.) In April 2019, Weinreich retained attorneys at Parr, Brown, Gee & Loveless in Salt Lake City, Utah, including Doug Waddoups and Jeffrey Hunt, to advise him and represent him personally in this growing dispute. (*Id.*) In approximately May 2019, Weinreich also retained attorney Ethan Davis formerly of Fitch Law Partners in Boston, Massachusetts (and now with Tymann, Davis & Duffy) for the same purpose. (*Id.*)

Between April 5, 2019 and June 24, 2019,[1] Weinreich engaged in extensive email communication with attorneys Hunt, Waddoups, and Davis using his mw@g-etg.com email

---

[1] The Privilege Log lists emails April 5, 2019 and January 31, 2020, but Weinreich stopped using his mw@g-etg.com email address to communication with his attorneys in late June 2019. (*See* Weinreich Decl., ¶ 17). At about that time, it had become clear to Weinreich that Brooks had

3

address.  (Weinreich Decl., ¶ 4.)  In these emails, Weinreich provided background information regarding the dispute, including his own analysis, and described in detail his concerns and hopes for an outcome, all in seeking his attorneys' expert analysis and advice.  (*Id*.)  In turn, Weinreich's attorneys provided their analysis, mental impressions, and advice regarding this dispute.  (*Id*.)  Via email, Weinreich and his attorneys discussed strategy, and engaged in drafting and revising of communications with Ms. Brooks' attorneys.  (*Id*.)

Weinreich also communicated with attorney Michael Lankford and his team at Creative Planning, who provided legal advice and guidance regarding estate planning issues.  (*Id*., ¶ 5).  These issues were unrelated to the growing dispute between Weinreich and Brooks.  (*Id*.)

Following production of these emails from Greenfield to counsel for Weinreich, Weinreich's counsel prepared a privilege log ("Privilege Log") of the emails over which Weinreich is claiming privilege, which is attached hereto as <u>Exhibit 1</u>.  Greenfield is seeking to compel production of all of the emails on the Privilege Log.

## II.     The @g-etg.com Email System

In addition to handling his full share of substantive project work as Co-Managing Principal with Ms. Brooks of numerous environmental trusts administered by the Company and having investment management and other authority over the $1.3 billion held in trust, prior to being frozen out, Weinreich was also largely responsible for running the operations side of the Company.  (Weinreich Decl., ¶ 8.)  That role included, among many others, overseeing the IT

---

already effectively reorganized the Company, leaving him on the outside looking in.  (*Id*.) Brooks formally announced this reorganization plan to the entire Company on July 1, 2019, but she had been working toward it for some time, increasingly marginalizing Weinreich with from the Company's employees and from responsibility, and consolidating her own position.  (*Id*.) When this became clear to Weinreich, he decided to stop using mw@g-etg.com to communicate with his attorneys.  (*Id*.)  Weinreich's explanation for the five entries on the Privilege Log that post-date June 24 is set forth the Weinreich Declaration at paragraphs 18-19.

functions of the Company, which included developing internal policies with respect to the email system and employee computer usage. (*Id*., ¶¶ 8-10.) The Company did not own, control or have its own physical email or other servers, but relied on third-party, independent email hosting services. (*Id*., ¶ 9.) As a completely virtual company with all employees working from their home offices in multiple states across the country, there was not a physical Company "site" for such a server to be housed. (*Id*.) The @g-etg.com email domain was cloud based and accessed through online email applications. (*Id*.) All Company employees, including Weinreich and Brooks, accessed their @g-etg.com email accounts using individualized passwords. (*Id*.) Employees did not, and were not required to, share their passwords with the Company. (*Id*.) Brooks did not have any responsibility or involvement in the email system, nor did she have personal access to anyone else's email, password, or an administrator's control center. (*Id*.) Brooks was generally unfamiliar with the Company's IT systems, and would contact Weinreich when she confronted issues. (*Id*.)

Weinreich was the partner responsible for developing the Company's formal policies. (Weinreich, Decl., ¶ 10.) The Company understood that employees would use their @g-etg.com email for personal emails, and there was no policy prohibiting such use. (*Id*.) The Company did not monitor computer or email use, and did not inspect personal emails. (*Id*.)

Greenfield's "New Employee Orientation Guide" ("Guide"), which the Company attaches to its Memorandum of Law, does not contain a company-wide email usage policy. (*See* Ex. B to Mem., Doc. No. 113-2.) Consistent with the Company's policy, the Guide does not prohibit use of @g-etg.com for personal emails, nor does it instruct that the Company monitors or inspects @g-etg.com email. (*See id*.; Weinreich Decl., ¶¶ 13-14.) In fact, the Guide does not mention Company email at all. The Guide states that all "work-related" information is the

property of Greenfield, which accurately mirrors the Company's policy that employees who have assigned their intellectual property rights to the Company in their written employment agreements do not own the work product that they produce. (Weinreich Decl., ¶ 13.) Thus, consistent with Company policy, non-work-related information does not belong to the Company. (*Id*.)

### III.  Joanna Pincus' Involvement in the Privileged Emails in Question

Joanna Pincus is Weinreich's long-time domestic and life partner. (Weinreich Decl., ¶20.) They have been together for 15 years. (*Id*.) They live together, socialize together, vacation together, spend holidays with each other, care for sick family members together, and share retirement and estate plans. (*Id*.) They confide in each other and support each other emotionally in their respective endeavors in life. (*Id*.) Pincus and Weinreich also worked together for many years at Greenfield. (*Id*., ¶ 21.) Thus, in addition to the deep personal bond that Weinreich and Pincus have, Weinreich greatly respects and relies upon Pincus' intellect, judgment, and guidance when making major life decisions. (*Id*.) Their relationship is described more in the Weinreich Declaration, paragraphs 20-22.

Of the 123 emails on the Privilege Log, Pincus received 43, either as a recipient or a cc. (*Id*., ¶ 22.) Pincus occupies a role of support and guidance for Weinreich, and it was essential to him that she be included in certain emails with his attorneys regarding this complex and devasting personal and professional crisis. (*Id*.) Weinreich believed that Pincus would maintain the confidentiality of the communications, which she has done. (*Id*.)

## ARGUMENT

Greenfield argues that the emails on the Privilege Log cannot be protected by the attorney-client privilege because Weinreich had no expectation of privacy using the Company

email system.  Further, Greenfield argues that Weinreich waived any privilege with respect to the emails sent to Pincus because she is a third party.  Both of these arguments fail.

I.  **The Attorney-Client Privilege Applies to the Emails in Question**

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  "The privilege operates to protect disclosures which might not have been made absent the privilege.  It encourages clients to seek an attorney's advice and to be truthful with the attorney, which in turn allows the attorney to give informed advice; the attorney-client privilege serves the public interest and the interest of the administration of justice."  *Comm. v. Goldman*, 395 Mass. 495, 502 (1985) (citations omitted).  While Greenfield points out that courts have stated that the privilege should be construed "narrowly," the Supreme Judicial Court has also held that "the tension is unquestionably resolved in favor of recognizing the privilege…"  *Commr. of Revenue v. Comcast Corp.*, 453 Mass. 293, 304 (2009).  The Supreme Judicial Court has made clear that "[t]he attorney-client privilege is so highly valued that, while it may appear 'to frustrate the investigative or fact-finding process . . . [and] create[] an inherent tension with society's need for full and complete disclosure of all relevant evidence during implementation of the judicial process,' it is acknowledged that the 'social good derived from the proper performance of the functions of lawyers acting for their clients . . . outweigh[s] the harm that may come from the suppression of the evidence.'"  *Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs.*, 449 Mass. 609, 615 (2007) (quoting from *In re Grand Jury Investigation*, 723 F.2d 447, 451 (6th Cir. 1983), *cert. denied*, 467 U.S. 1246 (1984) and *Comm.* v. *Goldman*, *supra* at 502, *cert. denied*, 474 U.S. 906 (1985), quoting *United States* v. *United Shoe Mach. Corp.*, 89 F. Supp. 357, 358 (D. Mass. 1950)).

7

"The classic formulation of the attorney-client privilege, which we indorse, is found in 8 J. Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961): '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.'" *Commr. of Revenue v. Comcast Corp.*, *supra* at 303. *See also Suffolk Constr. Co. v. Div. of Capital Asset Mgmt.*, 449 Mass. 444, 448 (2007) (privilege protects "all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice"). Here, the emails in question were confidential communications between Weinreich and his personal attorneys seeking and providing legal advice related to the very dispute at the heart of this case (*see* Weinreich Decl., ¶¶ 3-7; Privilege Log, Ex. 1); therefore, the attorney-client privilege applies.

## II.  Weinreich Had a Reasonable Expectation of Privacy in the Email Communications He Had with His Attorneys Using His Greenfield Email Address

In its Motion, Greenfield argues that Weinreich cannot satisfy his burden of establishing that his communications with his attorneys were confidential because they were "sent or received on Plaintiff's Company email address where he had no reasonable expectation of privacy." (Mem. at 6, Doc. No. 113.) Greenfield primarily bases its argument on the purported "computer information policy" contained its "New Employee Orientation Guide" ("Guide") dated January 30, 2018. (*Id.* at 3-4, 6-8.) Greenfield's argument fails for a number of reasons.

What the applicable case law—including the cases cited by Greenfield—makes clear is that mere fact of using Greenfield's email system does not automatically compel the conclusion that Weinreich had no reasonable expectation of privacy in his emails with his personal attorneys. The determination as to whether one has a reasonable expectation of privacy in using

8

a company's email system is a particularized one, and courts look to the circumstances of each case, with specific focus on the user's understanding of the company's policies and practices with respect to the email system. As an initial matter, the Guide on which Greenfield primarily relies does not even reference email or electronic communications, let alone set forth a Company-wide email policy. The Guide, and the portion of it on which Greenfield relies, only references a "Computer Hardware" policy. (*See* Ex. B to Mem., Doc. No. 113-2.) There is no specific email policy in that document, and Greenfield provides no evidence that a Company-wide written email policy existed. To the contrary, as is set forth below and described in detail in the Weinreich Declaration that accompanies this Opposition, the Company understood and permitted employees to use the @g-etg.com system for personal purposes and did not monitor or inspect its employees' email usage. (*See* Weinreich Decl., ¶¶ 8-15.) To the extent the Guide even addressed email usage it is entirely consistent with this understanding and approach. (*Id*. ¶¶ 12-13.) Thus, Weinreich's understanding, based upon his role as co-founder and 49% owner, and the partner responsible for overseeing the IT functions of the Company, including email, was that his use of mw@g-etg.com to communicate with his personal attorneys was private. (*Id*. ¶¶ 8-15.)

Greenfield cites two Massachusetts cases in support of its argument, neither of which concludes that an individual cannot have an expectation of privacy in personal emails sent using a company email merely by the fact that the company email system was used. *See Garrity v. John Hancock Mut. Life Ins. Co.*, 2002 U.S. Dist. LEXIS 8343 (D. Mass. 2002) (Zobel, J.) and *Nat'l Econ. Rsch. Assocs., Inc. v. Evans*, 2006 Mass. Super. LEXIS 371 (Mass. Super. Ct. August 2, 2006) (Gants, J.). In both *Garrity* and *National Economic Research Associates* the courts looked to the actual policies and practices of the employer with respect to the email

9

system in determining whether in the employee had a reasonable expectation of privacy. While Judge Zobel ultimately determined in *Garrity* that the employees did not have a reasonable expectation of privacy in sending obscene emails over the company email system,[2] the employer there had a written <u>*email specific*</u> policy that prohibited the obscene emails at issue and stated, among other things, that "**[a]ll** information stored, transmitted, received, or contained in the company's **E-mail** systems is the property of John Hancock" and that "[c]ompany management reserves the right to access **all E-mails** files." *Id*. at *2 (emphasis supplied). Similarly, Judge Gants stated in *dicta* in *National Economic Research Associates* that the employee could not have reasonably expected to communicate in confidence with his attorney using the company email because "the Manual plainly warned [defendant] that e-mails on the network could be read by NERA network administrators." *Id*. *6-8 (the Manual stated: "Network administrators can read your [electronic] mail!"). Thus, it is the policies and practices of the employer as understood by the employee that dictates the determination of the reasonable expectation of privacy.

The policies in *Garrity* and *National Economic Research Associates* are distinguishable on the critical points from the "Computer Hardware" policy contained in the Guide. The Guide identifies only **"<u>*work-related*</u>"** information as belonging to the Company; not <u>***all***</u> information as

---

[2] *Garrity* dealt with employees who were terminated for sending sexually explicit emails over company email and then sued John Hancock for wrongful termination, invasion of privacy, and violation of the Massachusetts wiretap statute. The case had nothing to do with the attorney-client privilege. This is important to note because the court held that, "[e]ven if plaintiffs had a reasonable expectation of privacy in their work e-mail, defendant's legitimate business interest in protecting its employees from harassment in the workplace would likely trump plaintiffs' privacy interests." *Garrity,* 2002 U.S. Dist. LEXIS 8343, at *6. Greenfield does not have a similar legitimate business interest in gaining access to Weinreich's communications with his personal attorneys. To the contrary, interests in enforcing the privilege and the good that that promotes outweighs any interest Greenfield has in the disclosure of the communications. *See Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs*., 449 Mass. 609, 615 (2007) (citations omitted).

did the policy in *Garrity*. (*See* Ex. B to Mem., Doc. No. 113-2; Weinreich Decl., ¶ 13.) Thus, by its very language, the "Computer Hardware" policy in the Guide acknowledges that employees may use Company computers for non-work-related purposes (i.e., personal), and that such non-work-related information does not belong to Greenfield. This was consistent with Weinreich's understanding at the time of the Company's policy (which he developed). (Weinreich Decl., ¶ 13-14.) Weinreich's emails with his personal attorneys regarding his individual legal issues are, therefore, not covered by the language in the Guide.[3] Also, unlike the written policies in *Garrity* and *National Economic Research Associates*, Greenfield's "Computer Hardware" policy in the Guide <u>does not even mention its email system</u>, much less make clear that all email—even non-work related—is the property of the Company and will be monitored and accessed. (*See* Ex. B to Mem., Doc. No. 113-2; Weinreich Decl., ¶¶ 13-14.) In fact, that was the opposite of Company policy and practice during the time that Weinreich was there. (Weinreich Decl., ¶ 10).

Furthermore, Weinreich stands on completely different ground from the employees in *Garrity* and *National Economic Research Associates*. Weinreich co-founded and co-owned the

---

[3] Greenfield argues that Weinreich's emails with his personal attorneys are "work-related" because the subject lines mention "Greenfield" and "Brooks." While the emails concerned Brooks' increasing efforts to freeze Weinreich out of Greenfield, and thus, use the words "Greenfield" and "Brooks," this does not make the emails "work-related" under any reasonable definition of the term as used in Greenfield's Guide. The latter part of the sentence in the Guide that contains the term "work-related" specifically references "document retention obligations set forth in the various Trust agreements." It is, therefore, reasonable to conclude that "work-related" is referring to information related to the work being done by each employee on behalf of the various environmental trusts that Greenfield served, for which there are various document retention requirements. That was Weinreich's understanding of the language in the Guide, which he was involved in developing. (Weinreich Decl., ¶ 13.) While emailing with co-workers exclusively regarding social plans may have to do with work in the loosest sense, it is not reasonable to conclude that such emails contain "work-related" information under the Guide. Similarly, Weinreich's communications with his attorneys regarding his personal legal dispute with Brooks cannot fairly be considered "work-related" information.

Company, served as its Vice President and a Director, and *himself* oversaw the IT functions of the Company and established policies regarding email and computer usage. (*See* Weinreich Decl., ¶¶ 8-10.) Weinreich—and therefore, the Company—understood that employees would use the @g-etg.com email system to send personal emails, and the policy as developed by him was not to prohibit, inspect, or monitor such use. (*Id*.) At least until he was frozen out and cut off, Weinreich understood that no one else would or could access his mw@g-etg.com email without his knowledge and permission. (*Id*., ¶ 15.) Weinreich never would have sent these emails had his understanding been different. (*Id*.) Therefore, unlike the employees in *Garrity* and *National Economic Research Associates*, Weinreich had a reasonable expectation of privacy in using his Company email to communicate with his attorneys. *See United States v. Long*, 64 M.J. 57, 64 (C.A.A.F. 2006) (concluding that employee had a reasonable expectation of privacy in e-mails prepared at work, transmitted over the employer's network system, stored on the employer's server, and retrieved by the employer's network administrator where the policies and practices of the employer required employees to keep private passwords, limited outside network access to the network administrator, and provided for very limited circumstances under which the employer would monitor the network for unauthorized use); *Convertino v. U.S. Department of Justice*, 674 F. Supp. 2d 97, 109-10 (D.D.C. 2009) (finding that an employee had a reasonable expectation of privacy emails that he sent through his work email account to his attorney because his employer did not ban personal use of the company email, the employee took steps to delete the emails as they entered his work account, and the employee was unaware that his employer would regularly access e-mails sent from his work account); *Leventhal v. Knapek,*, 266 F.3d 64, 74 (2d Cir. 2001) (employee had reasonable expectation of privacy in contents of workplace computer where the employee had a private office and exclusive use of his desk, filing cabinets

12

and computers, the employer did not have a general practice of routinely searching office computers, and had not "placed [the plaintiff] on notice that he should have no expectation of privacy in the contents of his office computer"); *United States v. Slanina*, 283 F.3d 670, 676-77 (5th Cir. 2002) (employee had reasonable expectation of privacy in his computer and files where the computer was maintained in a closed, locked office, the employee had installed passwords to limit access, and the employer 'did not disseminate any policy that prevented the storage of personal information on city computers and also did not inform its employees that computer usage and internet access would be monitored"), *vacated on other grounds*, 537 U.S. 802 (2002); *Haynes v. Office of the Attorney General*, 298 F. Supp. 2d 1154, 1161-62 (D. Kan. 2003) (employee had reasonable expectation of privacy in private computer files, despite computer screen warning that there shall be no expectation of privacy in using employer's computer system, where employees were allowed to use computers for private communications, were advised that unauthorized access to user's e-mail was prohibited, employees were given passwords to prevent access by others and no evidence was offered to show that the employer ever monitored private files or employee emails).[4]

---

[4] Even if Massachusetts choice of law applies, it does not necessarily follow that Massachusetts law of privilege exclusively applies here.  Massachusetts has adopted an interest analysis approach to choice of law issues (*see Command Transp., Inc. v. Y.S. Line (USA) Corp.*, 116 F.R.D. 94, 95 (D. Mass. 1987)), and while Greenfield is a Massachusetts corporation, Weinreich lives in Utah, Joanna Pincus lives in Utah, Weinreich's email communications with his attorneys primarily took place while he was in Utah, and, at least his Parr Brown attorneys, were also located in Utah.  Further, Greenfield is a virtual company with employees located around the country.  (*See* Weinreich Decl., ¶ 9). The email system was hosted virtually, so there was no physical email server on site in Massachusetts.  (*Id*.)  In fact, there was no Company "site" where such server could be maintained.  (*Id*.)  Thus, the interest analysis approach does not necessarily tip in favor of Massachusetts law exclusively applying to this issue.  Further, choice of law is only relevant to the extent that a conflict between the laws of privilege is identified, and it appears that the relevant Massachusetts cases consider the same factors with respect to determining an employee's expectation of privacy in their use of company email as the federal

### III. Weinreich Did Not Waive The Attorney-Client Privilege By Including Joanna Pincus in Some of the Emails

Greenfield argues that Weinreich has waived the attorney-client privilege with respect to the sub-set of emails on the Privilege Log that were sent to Joanna Pincus because she is a third party. (Mem. at 9, Doc. No. 113-2.) This argument fails because courts recognize that the privilege is not destroyed where close family members providing support and guidance are involved in attorney-client communications.[5]

In the often-cited case, *Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir. 1984), the First Circuit found that a father's involvement in his son's attorney-client communications did not waive the privilege. Looking at the relationship of the individuals and the intention of the client, the First Circuit held that "'[t]he key question in determining the existence of a privileged communication is 'whether the client reasonably understood the conference to be confidential.'" *Id.* at 849 (quoting from McCormick on Evidence, § 91 at 189 (1972)). "The law in this circuit [ ] looks to the intent of the client." *Id*. In reaching its determination, the First Circuit noted that, "[a]cting in a normal and supportive parental fashion, the father was present with his son throughout the conference with Attorney McNamara." *Id*. Thus, "[w]e can only conclude that it was [the client's] intention, as well as that of his father, that the consultation with McNamara was to be confidential and privileged." *Id.; see also United States v. Bigos*, 459 F.2d 639, 643 (1st Cir. 1972) (concluding that presence of client's father did not undermine the attorney-client privilege because the evidence supported that the intention of the parties was for the communication to be confidential: "While we agree that the presence of a third party commonly destroys the privilege,

---

cases cited herein. Thus, it is appropriate for this Court to consider decisions on this issue outside of Massachusetts.

[5] Weinreich is not asserting the spousal privilege. He and Pincus were not married when the emails were sent, and the privilege does not extend to writings.

it does so **only** insofar as it is indicative of the **intent** of the parties that their communication not be confidential.") (emphasis supplied); *Rosati v. Kuzman*, 660 A.2d 263, 267 (R.I. 1995) (citing *Kevlik, supra* and concluding that presence and participation of client's parents in communications with attorney did not vitiate the privilege where the parents "remained invaluable confidants to [plaintiff] through a tense legal proceeding."); *Schreiber v. Kollogg*, 1992 U.S. Dist. LEXIS 16180, at *3 (E.D. Pa. Oct. 19, 1992) (citing *Kevlik, supra* and *Bigos, supra* in concluding that presence of client's father in meeting with attorney did not vitiate privilege and memorandum drafted by father regarding that meeting was protected where "defendant's father was taking an ordinary parental interest and advisory role in son's legal affairs."); *United States v. Massachusetts Inst. Of Tech*, 129 F.3d 681, 684 (1st Cir. 1997) (determining that disclosure to a government auditor waived the privilege but contrasting that situation with disclosure to a closely related person: "…the underlying concern is functional: that the lawyer be able to consult with others needed in the representation and that the client be allowed to bring closely related persons who are appropriate, even if not vital, to a consultation.") (citing *Kevlik, supra*).

    Joanna Pincus is Weinreich's long-time domestic and life partner, and his closest confidant. (*See* Weinreich Decl., ¶ 20.) They have been together for 15 years, live together, socialize together, vacation together, spend holidays together, care for each other's family members, and share retirement and estate plans. (*Id.*) They confide in each other and support each other emotionally and otherwise in their respective endeavors in life. (*Id.*) Weinreich and Pincus also worked together for many years at Greenfield, so they know each other in a professional capacity as well. (*Id.*, ¶ 21.) Thus, in addition to the deep personal support that

Pincus provides to him, Weinreich greatly respects and relies upon Pincus' intellect, judgment, and guidance when making major life decisions. (*Id*., ¶¶ 20-22).

It was essential to Weinreich that Pincus be involved in the emails in question in order to provide her guidance and support with respect to this extremely difficult and complex personal and legal issue that also, given their relationship, directly impacted her and her future. (*Id*., ¶ 22.) Weinreich relied upon Pincus and knew she would maintain the confidential of the communications. (*Id*.) There is no evidence that Pincus betrayed that trust and disclosed these communications outside of the privilege circle. Thus, just as in *Kevlik*, *supra*, *Bigos, supra, Rosati, supra,* and *Schreiber, supra*, the attorney-client privilege was not waived in the emails sent to Pincus.[6]

### IV. If the Court Finds That Weinreich Did Not Have a Reasonable Expectation of Privacy in Email Communications with His Attorneys, the Court Should Apply That Determination to Emails Brooks Sent to Her Personal Attorneys Through the Greenfield Email System

For the reasons addressed above, Weinreich had a reasonable expectation of privacy in the email communications with his attorneys that he sent from his Greenfield email address, and the Court should enter an order finding the same. However, if the Court concludes that the attorney-client privilege does not attach to Weinreich's email communications with his personal attorneys using the @g-etg.com domain because there is no individual expectation of privacy in the Company's email system, then the Court's ruling should apply that determination to all emails sent to personal attorneys from Greenfield's email system. Specifically, to the extent that Brooks has used her Company email account to communicate with her personal attorneys—and

---

[6] Similarly, to the extent there are additional emails not on the Privilege Log between Weinreich and Pincus that contain or refer to attorney-client protected communications, the privilege should attach as well.

it seems almost certain that she has[7]—those emails also are necessarily not privileged.  In fact, Brooks would have had even **less** of an expectation of privacy in the emails than Weinreich during the time period that he was the administrator of the Company's email system.  Therefore, to the extent the Court determines Weinreich did not have a reasonable expectation of privacy in the emails he sent to his attorneys, Weinreich requests that the Court similarly order all such email communications between Brooks and her personal attorneys using cb@g-etg.com to be logged and produced.

## CONCLUSION

For the reasons above, Defendants' Motion should be DENIED.

Respectfully submitted,

**MARC WEINREICH,**

By his attorneys,

/s/ John E. (Jed) DeWick_____

Lisa G. Arrowood (BBO No. 022330)
John E. (Jed) DeWick (BBO No. 654723)
William F. McGonigle (BB) No. 569490)
ARROWOOD LLP
10 Post Office Square
7th Flr., South
Boston, MA 02109
Tel: 617-849-6200
larrowood@arrowoodllp.com
jdewick@arrowoodllp.com
wmcgonigle@arrowoodllp.com

-and-

Jenifer L. Tomchak (*pro hac vice*)
Nicole A. Skolout (*pro hac vice*)
TOMCHAK SKOLOUT

---

[7] As an example, Weinreich has witnessed Brooks use her cb@g-etg.com email to communicate with attorneys regarding a personal real estate matter.  (*See* Weinreich Decl., ¶ 10).

17

10 West 100 South, Suite 700<br>
Salt Lake City, UT 84101<br>
(801) 831-4820

Dated: December 22, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) or sent by first-class mail to any persons presently indicated as non-registered participants on this date.

/s/ William F. McGonigle

December 22, 2021